COUNCIL OF AND FOR THE BLIND OF DELAWARE COUNTY VALLEY, INC., et al., Appellants,

v.

Donald T. REGAN, Secretary of the Treasury, et al.

No. 81–1389.

United States Court of Appeals,
District of Columbia Circuit.

Argued 11 Jan. 1982.

Argued En Banc 1 Dec. 1982.

Decided 10 June 1983.

William C. McNeill, III, with whom Eduardo Peña, Jr., Washington, D.C., was on the brief, for appellants.

James Robertson, Washington, D.C., with whom William L. Robinson, Washington, D.C., was on the brief for amicus curiae urging reversal and remand for discovery and trial.

John H.E. Bayly, Jr., Asst. U.S. Atty., Washington, D.C., with whom Stanley S. Harris, U.S. Atty., Royce C. Lamberth and R. Craig Lawrence, Asst. U.S. Attys., and Richard S. Isen, Bruce H. Cameron and Bonnie L. Gay, Attys., Dept. of Treasury, Washington, D.C., were on the brief for appellees. Michael J. Ryan and Kenneth M. Raisler, Asst. U.S. Attys., Washington, D.C., also entered appearances for appellees.

Before ROBINSON, Chief Judge, and WRIGHT, TAMM, MacKINNON, WILKEY, WALD, MIKVA, EDWARDS, GINSBURG, BORK and SCALIA, Circuit Judges.

Opinion for the Court filed by Circuit Judge WILKEY.

Separate opinion concurring in part and dissenting in part filed by Chief Judge, SPOTTSWOOD W. ROBINSON, III, with whom Circuit Judges J. SKELLY WRIGHT, WALD, MIKVA and HARRY T. EDWARDS join.

WILKEY, Circuit Judge:

In this suit appellants, two individuals and seven organizations located in various places in the United States, challenge the way in which the Office of Revenue Sharing handles complaints that funds it distributes in block grants are being used in particular programs in an illegally discriminatory manner. The district court held that appellants failed to state a claim upon which relief could be granted. Because we conclude that no federal statute or provision of the Constitution authorizes the type of action appellants have brought, we affirm the district court's decision.

I. BACKGROUND

In 1972 Congress enacted the State and Local Fiscal Assistance Act [1] (Revenue Sharing Act), thereby giving legal effect to a concept which had been proposed intermittently for more than 20 years [2]—that the federal government make general revenue grants to state and local governments with no strings attached.[3] However, the idea of providing state and local governments with unlimited flexibility did not receive unanimous support. Some members of Congress were disturbed at the specter of permitting state and local officials, who had sometimes ignored or violated the civil rights of minorities and women, to expend federal funds without some accountability.[4]

---

1. Pub.L. No. 92–512, 86 Stat. 919 (1972) (codified, as amended, at 31 U.S.C. § 1221–1265 (1976 & Supp. IV 1980)).

2. "A form of general revenue sharing was actually in operation as early as 1836 ... [when] nearly $28 million was ... deposited with the State governments....

"In this century, congressional attempts to secure Federal tax sharing date back to 1949 when a Member [of Congress] from Kansas introduced a bill to transfer to State treasuries

1 percent of Federal individual and corporate income taxes raised within the State."
122 Cong.Rec. 17091 (remarks of Rep. Anderson).

3. S.Rep. No. 92–1050, 92d Cong., 2d Sess. 3, reprinted in 1972 U.S. Code Cong. & Ad.News 3874, 3876.

4. See, e.g., Civil Rights Aspects of General Revenue Sharing: Hearings Before the Subcommittee on Civil and Constitutional Rights of the House Committee on the Judiciary, 94th Cong., 1st Sess. 3 (1975).

Accordingly, the 1972 legislation included a provision which prohibited state and local governments from using revenue sharing funds in programs that discriminated on the basis of race, color, national origin, or sex.[5]

In 1976 the revenue sharing program was extended.[6] At that time Congress, responding to complaints that the Office of Revenue Sharing (ORS) was not adequately monitoring local government compliance with the nondiscrimination provision[7] (section 122), broadened the scope of section 122,[8] specified timetables the ORS was to meet in resolving discrimination complaints,[9] and authorized private citizen suits to enforce the provision.[10]

On 22 March 1976 a group of organizations and individuals[11] brought the present action against the Secretary of the Treasury, the Director of the ORS, and the Chief of the Civil Rights Branch of the ORS. In their complaint appellants alleged that each of the appellants resided in a locality which received funds under the Revenue Sharing Act; that the jurisdiction in which each lived was using those funds in a discriminatory manner in violation of section 122; and that each had filed an administrative complaint with the ORS to no avail. After the initial complaint was filed, the district court dismissed the case, holding that appellants lacked standing to challenge the ORS's actions. On appeal, this court reversed that decision.[12]

On remand appellants filed the amended complaint which is the focus of the present dispute. In that complaint appellants first alleged that the ORS had violated the Revenue Sharing Act by "failing to adhere to statutory and regulatory time limits" for resolving discrimination complaints and by failing to impose sanctions or take other steps effectively to enforce the "civil rights enforcement program."[13] Appellants also alleged that the ORS's failure to perform its duties violated the Administrative Procedure Act[14] (APA) and the Fifth Amendment.[15]

The relief sought by appellants, commensurate with the nationwide scope of the suit, was extremely broad based. The target of the action was the ORS's entire civil rights enforcement effort. Appellants

---

**5.** Pub.L. No. 92–512, § 122, 86 Stat. 919, 932 (1972) (codified, as amended, at 31 U.S.C. § 1242 (1976)).

**6.** Pub.L. No. 94–488, 90 Stat. 2341 (1976). The program was renewed again in 1980. Pub.L. No. 96–604, 94 Stat. 3516 (1980). At that time funding to state governments was phased out, so that since 1 October 1980 all revenue sharing grants have been made to local governments. 31 U.S.C. § 1226(a)(1) (Supp. V 1981). The entire program will expire 30 September 1983 unless Congress acts to renew it. Id. § 1224(d)(2).

**7.** See supra note 4.

**8.** Pub.L. No. 94–488, § 8, 90 Stat. 2341, 2350–51 (codified at 31 U.S.C. § 1242(a) (1976)).

**9.** Id. §§ 7, 8, 90 Stat. at 2350–52 (codified at 31 U.S.C. §§ 1242(b), 1245 (1976)).

**10.** Id. § 7, 90 Stat. at 2349–50 (codified at 31 U.S.C. § 1244 (1976)).

**11.** At one point the plaintiff group was composed of eleven organizations and two individuals. Plaintiffs' First Amended Complaint at ¶¶ 6–14, Council of and for the Blind of Delaware Valley, Inc. v. Regan, No. 76–467 (D.D.C. 4 Feb. 1981). However, the present group of appellants consists of two individuals who reside in California and seven organizations located in Pennsylvania, Tennessee, and California. Appellants' Original Brief at i.

**12.** Committee for Full Employment v. Blumenthal, 606 F.2d 1062 (D.C.Cir.1979).

**13.** Plaintiff's First Amended Complaint at ¶ 66. Appellants also alleged that the ORS violated the Act by "failing to issue notices of non compliance after receiving holdings" that the local governments were engaged in illegal discrimination. Id. However, none of the holdings received by the ORS relates to any of the remaining appellants. See infra note 67.

**14.** 5 U.S.C. §§ 701–706 (1976). See Plaintiffs' First Amended Complaint at ¶ 69.

**15.** Plaintiffs' First Amended Complaint at ¶ 68. Appellants also argued that they were entitled to relief under the Mandamus Act, 28 U.S.C. § 1361 (1976), and that the ORS violated Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d–2000d–6 (1976 & Supp. IV 1980). While we address appellants' mandamus argument, see infra text at notes 84–85, the district court's dismissal of the Title VI claim was not appealed.

asked the court, *inter alia,* to order the ORS to (1) "ensure that revenue sharing funding is not awarded to state and local governmental agencies which engage in discriminatory practices,"[16] (2) "issue regulations which adequately enforce [ORS's] civil rights obligations,"[17] (3) submit a "good faith request for each annual budgetary appropriation which includes provision for compliance positions sufficient to secure [ORS's] duties under § 122,"[18] and (4) fill "each civil rights compliance position immediately upon its opening."[19] Appellants also requested that the district court retain jurisdiction of the action until the ORS had "fully complied with the orders" issued by the court.[20] In essence, appellants asserted that the ORS was not adequately enforcing the nondiscrimination provision, and they asked the court to do whatever was necessary to ensure that the ORS improved its performance—including specific directions on what regulations to issue and what budgetary requests to make of Congress.[21]

On 4 February 1981 the district court granted the ORS's motion to dismiss the complaint, concluding that appellants had failed to state a legally cognizable claim for relief. The district court's judgment was affirmed by a panel of this court in an unpublished decision filed 1 February 1982. On 2 August 1982 appellants' suggestion for rehearing *en banc* was granted and the panel's February 1982 decision was vacated.

We agree with the district court that Congress has not authorized a private action against the ORS of the type appellants would maintain. Instead, Congress has authorized private suits to check specific discriminatory acts of recipients of revenue sharing funds. We further conclude that the private actions Congress has authorized afford an adequate remedy within the meaning of the APA to persons aggrieved by violations of the Revenue Sharing Act's nondiscrimination requirements. We therefore affirm the district court's decision.

## II. IMPLIED CAUSE OF ACTION UNDER THE REVENUE SHARING ACT

Appellants first contend that the Revenue Sharing Act creates a federal cause of action against the ORS for failing to investigate complaints against revenue sharing fund recipients and to monitor adequately compliance with the Act's civil rights safeguards. Appellants are unable to point to any provision of the Act which *expressly* creates such a cause of action. Thus, we can accept this argument only if we conclude that the private right of action appellants describe should be implied from the statute. An examination of the relevant factors, however, convinces us that such an action should not be implied.

■ In determining whether a private right of action should be implied from a federal statute, "the ultimate issue is whether Congress intended to create a private right of action."[22] The four factors outlined by the Supreme Court in *Cort v. Ash*[23] provide the "criteria through which this intent [can] be discerned."[24] These factors are:

First, is the plaintiff "one of the class for whose *especial* benefit the statute was

---

**16.** Plaintiffs' First Amended Complaint, Prayer for Relief, at ¶ D.

**17.** *Id.,* ¶ E.

**18.** *Id.,* ¶ G(1).

**19.** *Id.,* ¶ G(2).

**20.** *Id.,* ¶ I.

**21.** In their complaint appellants forthrightly state that the basis of their action is "not complaints of specific acts of discrimination against the ... local government recipients of revenue

sharing funds." Instead, it is an action "in the nature of mandamus to require ORS officials to perform their statutory duties" generally, rather than in a few specific instances. Plaintiffs' First Amendment Complaint at ¶ 4.

**22.** *California v. Sierra Club,* 451 U.S. 287, 293, 101 S.Ct. 1775, 1778, 68 L.Ed.2d 101 (1981).

**23.** 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975).

**24.** *California v. Sierra Club,* 451 U.S. at 293, 101 S.Ct. at 1778 (quoting *Davis v. Passman,* 442 U.S. 228, 241, 99 S.Ct. 2264, 2275, 60 L.Ed.2d 846 (1979)).

enacted," . . .—that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? . . . Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? . . . And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?[25]

Even assuming that the first and fourth *Cort* factors can be resolved in appellants' favor, consideration of the explicit and implicit legislative intent, coupled with an analysis of the underlying purposes of the legislative enforcement scheme, requires us to reject appellants' argument.

## A. *Nature of the Enforcement Scheme*

From its inception, the revenue sharing program was premised on the "no strings" philosophy, in contrast to the categorical grant programs then in existence.[26] Thus, the ORS was to have a relatively small staff to administer the provisions of section 122, and extensive reliance was placed on the investigative and auditing powers of other state and federal agencies.[27] This enforcement scheme did not prove adequate, however,[28] and in 1976 when the revenue sharing program was extended, changes were made in the enforcement mechanism.[29] A review of the resulting enforcement scheme shows that while Congress was aware that the ORS might not adequately handle discrimination complaints, it deliberately structured the manner in which revenue sharing nondiscrimination obligations could be monitored and challenged with a view to avoiding large expansion of the ORS's staff.

The 1976 amendments expanded the scope of the ORS's nondiscrimination enforcement authority[30] and established time limits within which the agency was to act.[31] Review of the ORS's performance was to be closely monitored by Congress. The Comptroller General[32] was directed to review the ORS's performance and to report to Congress so that its members could "evaluate compliance and operations under the [Act],"[33] and presumably make whatever adjustments they deemed necessary. Congress' oversight function was further aided by the requirement that the ORS annually provide Congress with a "detailed analysis of . . . the measures taken to comply with section [122]."[34]

■ An augmented role for private citizens was expressly delineated in the 1976 legislation. First, the state and local governments were required to hold public hearings at which "citizens shall have the opportunity to provide written and oral comment on the possible uses of [revenue sharing] funds."[35] This afforded citizens the chance to spotlight illegal discrimination at the outset. Of more importance to the present dispute, private citizens were, in a limited way, also authorized to initiate

---

25. *Cort v. Ash,* 422 U.S. at 78, 95 S.Ct. at 2087 (emphasis in the original) (citations omitted).

26. *See* S.REP. No. 92–1050, 92d Cong., 2d Sess. 3, *reprinted in* 1972 U.S.CODE CONG. & AD.NEWS 3874, 3876.

27. *See Civil Rights Aspects of General Revenue Sharing: Hearing Before the Subcommittee on Civil Rights and Constitutional Rights of the House Committee on the Judiciary,* 93rd Cong., 1st Sess. 3–6 (1973); *State and Local Fiscal Assistance Act: Hearings on H.R. 6558 and Related Bills before a Subcommittee of the House Committee on Government Operations,* 94th Cong., 1st Sess. 43 (1975).

28. *See supra* text at note 7.

29. *See supra* text at notes 8–10.

30. 31 U.S.C. §§ 1242(b)(2) & (3), 1242(d) (1976).

31. *Id.,* §§ 1242(b), 1245.

32. *Id.,* § 1243(c)(8).

33. *Id.,* § 1243(c)(9).

34. *Id.,* § 1241(f)(1).

35. *Id.,* § 1241(b)(1). *See also id.,* § 1241(b)(2).

post-budget compliance review. Under the 1976 law, persons aggrieved by violations of the nondiscrimination provision may file an administrative complaint with the ORS.[36] Within ninety days of the filing, ORS is directed to have conducted an investigation and to have made a finding.[37] If the ORS determines that the recipient entity has "more likely than not" violated the nondiscrimination provision,[38] various enforcement proceedings are to be initiated under section 122(b).[39] If, on the other hand, the ORS *"fails to issue a determination" within the ninety day period,* or if it determines that the recipient has "not failed to comply" with the nondiscrimination provision, the complainant is deemed to have exhausted his administrative remedies and he is entitled to bring an action under section 124(a).[40] Thus, Congress was aware that the ORS might fail to act on administrative complaints within the ninety-day period and it chose to give the aggrieved persons the sole remedy of filing a suit under section 124. Giving private citizens a remedy outside section 124 for the ORS's failure to investigate and follow up on complaints would significantly alter the scheme Congress crafted. Therefore, unless section 124 authorizes the type of suit appellants have brought, they are not entitled to bring it. After examining the legislative history behind section 124 we conclude that Congress did not intend to authorize private citizens to bring suit under that section naming the ORS as the sole or a principal defendant.[41]

### B. *Expressions of Legislative Intent*

Prior to 1976 there was no express private right of action in the Revenue Sharing Act. However, some courts had held that a private cause of action could be implied under the Act,[42] and in one of those suits the ORS was a co-defendant. Appellants contend that section 124 merely codified those decisions. Thus, they argue, a suit like the present one was not foreclosed by the passage of section 124. Three separate provisions of the section are cited as support for this conclusion.

First, appellants note that while section 124 provides for a civil action by any aggrieved person whenever a state or local government has engaged in any action or practice prohibited by the Revenue Sharing Act,[43] it does not expressly delineate who can be a defendant in such a suit. Appellants argue that it is therefore possible to infer that the ORS can be a defendant in such an action.

Second, appellants point to the section 124(e) provision that attorneys' fees may be awarded "to the prevailing party, other than the United States ... and the United States shall be liable for fees and costs the same as a private person."[44] This, appellants maintain, is a further indication that the United States (in the form of the ORS) can be sued under section 124.

Finally, appellants remind us that in a suit under section 124 the court is empowered to "grant as relief to the plaintiff any temporary restraining order, preliminary or permanent injunction or other order, includ-

---

36. *Id.,* § 1244(d).

37. *Id.,* § 1245.

38. *Id.,* § 1242(c)(4).

39. *Id.,* § 1242(b).

40. *Id.,* § 1244(d). Section 124(a) provides: Whenever a State government or a unit of local government, or any officer or employee thereof acting in an official capacity, has engaged or is engaging in any act or practice prohibited by this chapter, upon exhaustion of administrative remedies, a civil action may be instituted by the person aggrieved in an appropriate United States district court or in a State court of general jurisdiction.

41. The ORS may, however, be joined as a nominal defendant for purposes of relief. *See infra* note 68. It is also possible that the ORS may be a defendant in other limited circumstances, although we do not now decide that issue. *See infra* note 67.

42. *United States v. City of Chicago,* 395 F.Supp. 329 (N.D.Ill.), *aff'd,* 525 F.2d 695 (7th Cir.1975); *Mathews v. Massell,* 356 F.Supp. 291 (N.D.Ga.1973). In *City of Chicago,* the ORS was joined as a defendant. *See infra* text at notes 46–47.

43. 31 U.S.C. § 1244(a) (1976).

44. *Id.,* § 1244(e).

ing *the suspension, termination, or repayment of funds, or placing any further payments under this chapter in escrow pending the outcome of the litigation.*"[45] Appellants argue that the court's power to order a termination of ORS funding necessarily implies that the ORS can be designated as a defendant in such a suit. These arguments do not survive attentive review.

First, appellants' entire position is based on the premise that before 1976 a suit of this nature could be mounted against the ORS. However, that premise is not sound. Although the ORS was involved as a defendant in one pre-1976 suit under the Revenue Sharing Act,[46] that suit focused on discrimination in a particular local agency (the Chicago Police Department), not on the nationwide failure of the ORS's complaint-processing system. Indeed, the order against the ORS in *City of Chicago* was issued only *after* the district court found that the local government was engaged in illegal discrimination.[47] Thus, contrary to appellants' argument, no pre-1976 precedent exists for the type of suit appellants now seek to maintain. Appellants' argument that the 1976 amendment merely codified existing law is therefore unavailing.

Further, the statute by its terms appears targeted to suits against state or local governments. Although section 124 does not expressly delineate potential defendants, the section does state that an aggrieved person has a cause of action only when "a *State government or a unit of local government* ... is engaging in any act or practice prohibited by this chapter."[48] The

section does not focus on the federal government's activities. The House conferees, in explaining the version of the bill which was adopted by the conference, described the nature of a suit under section 124 as follows: "This action, alleging any violation of the provisions of this Act, *by a State government or a unit of local government,* could seek such relief as a temporary restraining order ...."[49]

Finally, and most importantly, an examination of the history of the 1976 legislation reveals that the version ultimately enacted reflects the views of members of Congress who were intent on ensuring that the ORS, with its limited resources, would *not* be a principal defendant in section 124 suits. As the expiration date of the original Revenue Sharing Act approached, the House Subcommittee on Intergovernmental Relations and Human Resources held two sets of comprehensive hearings in order to evaluate how the program was working and determine whether, and in what form, the program should be extended.[50] The Subcommittee examined a wide range of proposals and, after substantial debate, submitted a clean bill to the House Committee on Government Operations.[51] The bill submitted to the Committee represented a compromise among "those forces wishing a simple extension of the program basically in its present form and those forces wishing to drastically alter the program by turning it into an instrument for the reform of certain State and local government activities and those forces wishing to simply terminate the program."[52] This "delicate" compro-

---

**45.** *Id.,* § 1244(b) (emphasis added).

**46.** *United States v. City of Chicago,* 395 F.Supp. 329 (N.D.Ill.), *aff'd,* 525 F.2d 695 (7th Cir.1975).

**47.** *Id.* at 335. It appears that the ORS was joined as a defendant in *City of Chicago* merely to ensure that funding would terminate if the plaintiffs were successful in their suit against the local government. Our decision does not rule out that possibility. *See infra* note 68.

**48.** 31 U.S.C. § 1244(a) (1976) (emphasis added).

**49.** H.Rep. No. 94-1720, 94th Cong., 2d Sess. 37, *reprinted in* 1976 U.S. Code Cong. & Ad.News 5151, 5205 (emphasis added).

**50.** H.Rep. No. 94-1165 (Part I), 94th Cong., 2d Sess. 4 (1976). *See also* 122 Cong.Rec. 17069 (remarks of Rep. Fountain).

**51.** H.Rep. No. 94-1165 (Part I), 94th Cong., 2d Sess. 4-5 (1976). *See also* 122 Cong.Rec. 17069 (remarks of Rep. Fountain).

**52.** 122 Cong Rec. 17082 (remarks of Rep. Steelman).

mise was changed by the Committee,[53] which adopted a "number of amendments,"[54] and reported the amended bill to the entire House.

Several members of the Committee, while supporting the Committee bill because of their "strong commitment to the General Revenue Sharing concept,"[55] noted their dissatisfaction with some of the changes made by the Committee and expressed their hope that the full House would "modify the injurious provisions."[56] One of the Committee amendments to which the dissatisfied legislators objected was the change in the nondiscrimination provisions.[57] After noting the specific differences between the version adopted by the Committee and that originally proposed by the Subcommittee, the dissatisfied members stated:

> The central question is whether the United States government shall be in the position of defendant or plaintiff in civil rights enforcement cases. *If the United States becomes a defendant in every civil rights case involving revenue sharing funds, its capacity to enforce laws will be severely limited. The Justice Department's enforcement powers would be greatly strengthened if such private suits were authorized against State or local governments, but not the Federal govern-*

*ment.* The role of the Justice Department should be the enforcement of the civil rights provision through litigation.[58] These members of Congress were clearly intent on ensuring that the ORS not be a principal party-defendant in a section 124 action and they felt that while the Subcommittee bill accomplished this purpose, the Committee bill did not.

The dissatisfied members' wish that the "injurious provisions" introduced by the Committee (including the nondiscrimination enforcement provision) would be modified by the entire House[59] was soon realized. Representative Horton (one of the dissatisfied members) attempted to substitute the Subcommittee bill for the version adopted by the Committee.[60] He abandoned that effort, however, when Representative Fountain offered to substitute "the bill approved by the subcommittee after intensive and careful consideration of this matter, together with the seven *noncontroversial* amendments adopted by the full committee."[61] The version of section 124[62] contained in the Fountain substitute was *identical* to that contained in the Horton substitute, which was the Subcommittee bill.[63] The House ultimately adopted this version of section 124,[64] as did the Senate.[65] As noted earlier, the Subcommittee bill was

**53.** *Id. See also id.* at 17074 (remarks of Rep. Horton) ("In all my experience in the House, I never saw a bill so destroyed in just a few hours as occurred in the full Government Operations Committee when we adopted some of these amendments."); *id.* at 17074 (remarks of Rep. Fuqua).

**54.** H.Rep. No. 94–1165 (Part I), 94th Cong., 2d Sess. 5 (1976).

**55.** *Id.* at 115 (Additional views of Reps. Horton, Erlenborn, Wydler, C. Brown, McCloskey, Steiger, Thone, Steelman, Pritchard, Forsythe, Kasten, Gradison, and G. Brown).

**56.** *Id.*

**57.** *Id.* at 111–12.

**58.** *Id.* at 112 (emphasis added).

**59.** *See supra* text at note 56.

**60.** 122 Cong.Rec. 17337 (remarks of Rep. Horton). *See also id.* at 17068.

**61.** 122 Cong.Rec. 17341 (remarks of Rep. Fountain) (emphasis added). After ascertaining that the Committee amendments contained in the Fountain substitute were not the ones to which the dissatisfied members objected, Representative Horton shifted his support to that substitute. *Id.* at 17342.

**62.** As introduced in the House, the private civil action was contained in section 125. *See* 122 Cong.Rec. 17340. The provision became section 124 after the Senate made various changes to the entire Act. The substance of section 124(a), however, was left unchanged. *See infra* note 65.

**63.** *Compare* 122 Cong.Rec. 17340 *with id.* at 17337.

**64.** 122 Cong.Rec. 17368, 17395.

**65.** 122 Cong.Rec. 30326–29 (1976). The Senate did add a provision outlining administrative remedies which had to be exhausted, 122 Cong. Rec. 29866–67 (1976), and a provision authoriz-

designed to authorize private suits "against State or local governments, but not the Federal government." [66] Thus, the version of section 124 ultimately adopted by Congress reflects a legislative intent to focus private actions on revenue sharing fund recipients and not on the ORS.

[blank] In sum, an examination of the overall enforcement scheme and the legislative history behind the enactment of that scheme convinces us that Congress was aware that the type of agency inaction alleged here [67] could occur, and that it chose to authorize private suits principally against

ing attorneys' fees. 122 Cong.Rec. 29908 (1976). However, the House version of section 124(a) was left unchanged so that the provision that became law was identical to that originally offered by the Subcommittee. *Compare* 31 U.S.C. § 1244(a) (1976) with 122 Cong.Rec. 17337.

**66.** H.Rep. No. 94–1165 (Part I), 94th Cong., 2d Sess. 112 (1976). *See supra* text at notes 55–58.

**67.** Our decision deals only with the situation in which it is alleged that the ORS has failed adequately to investigate or respond to administrative complaints or take steps to increase its capability to do so. We do *not* decide whether a person aggrieved *by conduct of a revenue sharing fund recipient* that violates section 122(a) could bring an action directly against the ORS if, *after* the ORS received a "holding," as defined in 31 U.S.C. § 1242(c)(1), or a "finding," as defined in section 1242(c)(4), the ORS refused to proceed against the local government as required by 31 U.S.C. § 1242(b) (1976).

In their complaint, appellants cite seven judicial "holdings" which they allege were received by the ORS, but which the ORS did not follow up on. Plaintiffs' First Amended Complaint at ¶¶ 27, 31 (*Pennsylvania v. Rizzo,* 9 E.P.D. ¶ 9891 (E.D.Pa.1975); *Pennsylvania v. O'Neill,* 348 F.Supp. 1084 (E.D.Pa.1972), *aff'd in part, vacated in part,* 473 F.2d 1029 (3d Cir.1973)); at ¶¶ 35–38 (*Jones v. Milwaukee County,* 19 E.P.D. ¶ 9209 (E.D.Wis.1979); *United States v. City of Milwaukee,* 441 F.Supp. 1371 (E.D.Wis. 1977); *Crockett v. Green,* 388 F.Supp. 912 (E.D.Wis.1975), *aff'd,* 534 F.2d 715 (7th Cir. 1976)); at ¶¶ 50–51 (*United States v. San Diego County,* 20 E.P.D. ¶ 30,154 (S.D.Cal.1979)). However, these allegations are not sufficient to state a cause of action under the theory noted in the preceding paragraph because *none* of the cited holdings relates to the appellants in the present case. None of the appellants resides in either Milwaukee or San Diego. Casa Justicia which is composed of Mexican-American individuals in the city and county of San Diego, Plaintiffs' First Amended Complaint at ¶ 10, was voluntarily dismissed from this case. *See* Joint Appendix at 119. Northside Community Design Center and Latin American Union for Civil Rights, both organizations representing persons in Milwaukee, Plaintiffs' First Amended Complaint at ¶ 7, were plaintiffs in this case,

but they are *not* parties to this appeal. *See* Rule 8(c) Certificate, Appellants' Original Brief at i. And, although the Council of and for the Blind of Delaware County Valley, Inc., serves people in the Philadelphia area, *see* Plaintiffs' First Amended Complaint at ¶ 6, it represents the interests of blind persons, not racial minorities, which were the groups discriminated against in the cited Philadelphia cases.

Similarly, appellants' allegations that an ORS employee determined that the City of Santa Maria, and the county of San Luis Obispo, California, were not in compliance with section 122 and that nevertheless, the ORS failed to enter into a compliance agreement with those entities, Plaintiffs' First Amended Complaint at ¶¶ 43–44, 60–61, are not sufficient to state a cause of action under the theory outlined above. The ORS is not *required* to enter a written compliance agreement with a local government *everytime* one of its investigators determines that the local government is *more likely than not* in violation of the Act. The ORS is first required to send the local government a noncompliance notice. 31 U.S.C. § 1242(b)(1) (1976). The local government is then entitled to present evidence to the Secretary on the issues of whether the discrimination was unlawful and whether the program which is allegedly in violation has been funded by revenue sharing funds. *Id.* at § 1242(b)(2). The Secretary is *then* required to determine whether the local government *is* violating section 1242(a). *Id.* If the *Secretary* determines that the local government is in violation of the Act, he must temporarily suspend revenue sharing payments (pending a hearing before an administrative law judge) unless a compliance agreement is entered into. *Id.* If, on the other hand, the *Secretary* determines that the local government is *not* in violation of the Act, he is *not required to do anything.* Thus, appellants have failed to allege that the Secretary failed to carry out his duties under section 1242 because the averments of the complaint do not set forth all of the steps which must occur before a noncompliance agreement must be entered into. It is *possible* that the appellants *who reside in the localities in question,* if they qualify as "aggrieved persons," MAY be able to state a cause of action against the ORS under the theory articulated in the first paragraph, but they have not done so in this case. We note that even if the theory advanced in the first paragraph could be the basis of a situa-

the state or local government engaged in the discrimination, rather than against the ORS, whose limited resources might be overburdened if the agency were cast in the role of principal defender in section 124 suits.[68] Thus, we hold that the Revenue Sharing Act does not provide for a private cause of action of the type brought by appellants in this case.[69] We therefore turn to their other arguments.

### III. CAUSE OF ACTION UNDER THE ADMINISTRATIVE PROCEDURE ACT

■ Appellants contend that even if their complaint does not state a cause of action under the Revenue Sharing Act, they are still entitled to relief under the APA. Both parties agree that the ORS's failure to process and resolve administrative com-plaints in a timely manner constitutes final agency action within the meaning of the APA.[70] However, the APA limits judicial review to "[a]gency action made reviewable by statute and final agency action *for which there is no other adequate remedy in a court.*"[71] We have already decided that the action of the ORS challenged by appellants is not reviewable by statute.[72] Therefore, in determining whether appellants have stated a cause of action under the APA, the key inquiry is whether section 124 provides an adequate remedy for the wrong allegedly inflicted on appellants by the ORS. We conclude that it does.

■ Appellants argue that if, as we hold, section 124 is largely limited to suits against state and local governments, it is an

---

tion-specific suit (something we do *not* now decide) it could not be used as a springboard for a nationwide suit seeking grand scale relief.

**68.** The fact that attorneys' fees may be awarded against the United States does not undermine the above conclusion. It is important to note that section 124(e) provides that "any prevailing *party*" may recover attorneys' fees. 31 U.S.C. § 1244(e) (1976) (emphasis added). It does not limit such awards to prevailing *plaintiffs.* Since the United States can intervene as a *plaintiff* in a section 124 action, 31 U.S.C. § 1244(c) (1976), a provision permitting attorneys' fees against the United States would allow the local government (which is the defendant in a section 124 suit) to recover attorneys' fees against the United States if the local government prevails.

Nor does the court's power to order a termination of ORS funding, 31 U.S.C. § 1244(b) (1976), detract from our conclusion. The ORS may be joined as a nominal defendant in order to obtain that relief, as the district court noted. *Council of and for the Blind of Delaware Valley, Inc.,* No. 76–0467, *slip op.* at 3 n. 3 (D.D.C. 4 Feb. 1981). Such limited ORS participation in a section 124 suit would not alter the nature of the cause of action which arises under that section—one "alleging . . . violation of the provisions of [the Revenue Sharing Act] by a State government or a unit of local government." H. REP. No. 94–1720, 94th Cong., 2d Sess. 37, *reprinted in* 1976 U.S.CODE CONG. & AD.NEWS 5151, 5205.

**69.** Appellants argue that our disposition of the present case is controlled by this court's prior decision in *Adams v. Richardson,* 480 F.2d 1159 (D.C.Cir.1973) (en banc). In *Adams* plaintiffs brought an action directly against the funding agency (HEW) even though the recipients of the funds (public educational institutions) were the entities discriminating against the plaintiffs. However, *Adams* is distinguishable. First, the legislative history behind the statute involved in *Adams* (Title VI of the Civil Rights Act) was different from that in the present case. Unlike the Revenue Sharing Act, Title VI was not designed as a "no strings" grant scheme. There was, therefore, not the same congressional emphasis on limiting the size of the funding agency's staff. Second, Congress did not expressly provide a remedy for the agency's failure to enforce the nondiscrimination provision of Title VI. Accordingly, in *Adams* we were not facing a situation in which Congress had already indicated how it wanted private discrimination suits to be structured. In the present situation Congress has expressly provided a remedy; one directed primarily toward the local government, not the ORS.

Congress can choose how it wants to enforce a nondiscrimination provision. It is clear that by 1976 Congress knew how to create suits directly against a federal agency which failed to carry out its statutorily imposed duties. *See, e.g.,* 33 U.S.C. § 1365(a)(2) (1976) (Federal Water Pollution Control Amendments of 1972); 42 U.S.C. § 7604 (Supp. V 1981) (Clean Air Act Amendments of 1970). We are therefore hesitant to infer that Congress has authorized such suits when it did not expressly say so. *Cf. Touche Ross & Co. v. Redington,* 442 U.S. 560, 572, 99 S.Ct. 2479, 2487, 61 L.Ed.2d 82 (1979).

**70.** *See Environmental Defense Fund, Inc. v. Hardin,* 428 F.2d 1093, 1099 (D.C.Cir.1970).

**71.** 5 U.S.C. § 704 (1976) (emphasis added).

**72.** *See supra* text at notes 22–69.

inadequate remedy because it does not provide redress against the ORS's failure to enforce the statute's nondiscrimination command. If the ORS pursued complaints adequately, funded units would comply with the law sooner, appellants postulate, and the need for appellants to resort to expensive, time-consuming section 124 suits would diminish.[73] However, it is not clear at all that a nationwide suit would remedy appellants' grievances more *effectively* than several section 124 suits. If the district court granted the broad relief requested by appellants,[74] the court could thereafter be called upon to supervise the ORS's handling of virtually every alleged violation of section 122. If the ORS slipped with regard to one of the programs at issue here, appellants could ask the district court to hold the agency in contempt, but such a proceeding would have to be initiated each time the ORS fell short of adequate oversight. Therefore, granting appellants the relief requested in this suit would not necessarily obviate the need to return to court, although it would empower one district judge to act as supreme supervisor of the ORS's enforcement activities—a role more appropriately reserved for the Executive under the oversight of Congress.

Even if we agreed that one nationwide suit would be *more effective* than several section 124 suits, that does not mean that the remedy provided by Congress is *inadequate*.[75] As the district court observed, the nondiscrimination provision of the Revenue Sharing Act was designed "to guarantee that the federal government does not finance discriminatory practices by recipients of federal funds." [76] Thus, a person aggrieved by a violation of section 122 is entitled to two types of relief: (1) a cessation of the discriminatory practice or (2) a termination of the federal funding. Both of these types of relief are available under section 124,[77] and the 90-day exhaustion requirement ensures that the aggrieved citizen will not be required to endure lengthy administrative delays in obtaining that relief.[78] Indeed, had the ORS acted favorably on appellants' complaints, the relief, while possibly obtained more quickly, might have been more limited than that available under section 124 since the ORS, although it could seek voluntary compliance, could not order the local government to stop the discrimination. Therefore, even if, as appellants argue, a nationwide suit would be more *effective* than several section 124 suits, we hold

---

**73.** Appellants' En Banc Brief at 21–23.

**74.** *See supra* text at notes 16–20.

**75.** The dissent properly notes that the ORS's "failure to process and resolve administrative complaints in a *timely fashion*" is the final agency action of which appellants complain. Dissent at 1549 (emphasis added). The dissent also properly notes that "when the grievance is simply that ORS *has not met the 90-day deadline,* the party's sole recourse is a § 124 action against the recipient, and ORS nominally, for relief from discriminatory activity." *Id.* at 1540 n. 20 (emphasis added). This is because "*Congress* realized that ORS might not be able to adhere to this timetable," and it chose to give the complainant the right to initiate an action under section 124 when the time for agency action has expired. *Id.* at 1540 n. 20. Therefore, the dissent's disagreement is really with Congress. Congress foresaw the allegedly illegal activity of which appellants complain and it adopted a remedy for the agency action *in question which it considered adequate.* We defer to the congressional judgment that the section 124 remedy is adequate, the dissent

does not. The dissent thus errs when it charges that *our* result is "inconsistent with the will of Congress." *Id.* at 1551 n. 82. Rather, it is the dissent which opposes the congressional will.

**76.** *Council of and for the Blind of Delaware Valley, Inc. v. Miller,* No. 76–0467, *slip op.* at 11 (D.D.C. 4 Feb. 1981) (citing H.Rep. No. 94–1165 (Part I), 94th Cong., 2d Sess. 1, 12 (1976); S. Rep. No. 94–1207, 94th Cong., 2d Sess. 26–27, *reprinted in* 1976 U.S.Code Cong. & Ad.News 5176–77).

**77.** Under section 124 the district court is authorized to issue "*any* temporary restraining order, preliminary or permanent injunction, or other order, including the suspension, or termination or repayment of funds ...." 31 U.S.C. § 1244(b) (1976) (emphasis added). Both parties agree that this includes the power to order the local governments to discontinue discrimination in federally funded activities. Appellants' En Banc Brief at 9–14; Appellees' En Banc Brief at 13.

**78.** 31 U.S.C. § 1244(d) (1976).

that the remedy provided by Congress is *adequate* to redress the discrimination allegedly encountered by appellants.

*Amicus curiae*[79] argues that we should remand this case to allow appellants to engage in discovery concerning the practices of the ORS so that the court will be in a better position to determine the adequacy of the remedy available under section 124. We conclude that such an action is unwarranted. Section 124 provides the district court with all the tools it needs to vindicate all the rights granted to aggrieved persons under the Revenue Sharing Act.[80] Thus, inquiry into the ORS's allegedly ineffective enforcement is neither necessary nor proper. Discovery of the magnitude suggested by *amicus,* an investigation of "the specific and ongoing practices of the ORS,"[81] is more properly conducted by a Congressional subcommittee as part of its oversight function.[82] What appellants and amicus are seeking here is not only the broadest possible discovery but the broadest possible continuing supervision of an Executive agency by a court. This is the type of judicial activity which has produced condemnation of the courts for overstepping their proper role. To utilize our judicial power in that manner would be particularly inappropriate in this case where the statute and the legislative debates demonstrate an intent to shield the agency itself from judicial interference.

### IV. CAUSE OF ACTION UNDER THE MANDAMUS ACT

Appellants also argue that they are entitled to relief under 28 U.S.C. § 1361 which

provides that "[t]he district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or an agency thereof to perform a duty owed to the plaintiff."[83] This relief is available if (1) the plaintiff has a clear right to relief; (2) the defendant has a clear duty to act; and (3) there is no other adequate remedy available to the plaintiff.[84] Since, as outlined in part III above, an adequate remedy is available to appellants, they may not invoke the extraordinary remedy afforded by the Mandamus Act.[85]

### V. CAUSE OF ACTION UNDER THE FIFTH AMENDMENT

[9] Appellants' final argument is that their complaint states a cause of action under the Fifth Amendment. They argue that the ORS's failure to process their discrimination complaints in the manner required by the Revenue Sharing Act and applicable regulations is of itself a violation of due process.[86] Such allegations do not state a cause of action under the Constitution because they do not establish that appellants have been deprived of any constitutionally protected interest. The agency's failure to follow the applicable rules is relevant to a due process claim *only if the agency's action deprives the plaintiff of life, liberty, or property.*[87] In the present case it does not.

The ORS's failure to process appellants' complaints does not *extinguish* their rights under the Act, it merely denies them the assistance of the ORS in vindicating those rights. In order to state a legally

---

79. The Lawyers' Committee for Civil Rights Under Law.

80. *See supra* text at notes 77–78.

81. Amicus Brief at 15.

82. *See* 31 U.S.C. § 1241(f), 1243(c)(9) (1976); *Hearings supra* note 4.

83. 28 U.S.C. § 1361 (1976).

84. *See Jones v. Alexander,* 609 F.2d 778, 781 (5th Cir.), *cert. denied,* 449 U.S. 832, 101 S.Ct. 100, 66 L.Ed.2d 37 (1980).

85. *See Allied Chemical Corp. v. Daiflon, Inc.,* 449 U.S. 33, 101 S.Ct. 188, 66 L.Ed.2d 193 (1980).

86. Appellants' Original Brief at 42. *See also* Appellants' En Banc Reply Brief at 16.

87. *See, e.g., Devine v. Cleland,* 616 F.2d 1080, 1085–87 (9th Cir.1980) (agency's failure to follow the statutory procedure considered only *after* court found that the procedure followed deprived plaintiff of a constitutionally protected property interest).

cognizable constitutional claim, appellants must allege more than the deprivation of the *expectation* that the agency will carry out its duties. If we concluded that such an expectation was protected under the Constitution, this court would be swamped with constitutional claims because every agency deviation from the statutory norm would raise constitutional questions.

Our response to appellants' constitutional argument is summed up in language used by the First Circuit when denying a similar claim against a Regional Director of the Equal Employment Opportunity Commission.

> [T]his case involves the loss of alleged statutory rights to administrative assistance in the vindication of underlying, fundamental statutory and constitutional interests. The interests themselves have not been lost, only the help that Congress intended charging parties receive in vindicating those rights. We think that such statutory rights, if they be "liberty or property" at all within the meaning of the Due Process Clause, are so tangential to the central thrust of [Revenue Sharing] rights—for the deprivation of which Congress *did* provide a remedy—that an implied right of action cannot and should not be found here. Indeed, were we to find that the right to [ORS] assistance is protected by an implied right of action found in the Fifth Amendment, then every federal bureaucrat would be subject to judicial review of the most minute aspects of his responsibilities as they affect members of the public. Such is a task we are neither eager nor constitutionally competent to undertake.[88]

## VI. Conclusion

The revenue sharing program, premised as it is on the "no strings" concept, is designed to operate with a relatively small federal staff. Congress directed that staff to do its part in ensuring that the funds distributed under the program were not used in an unlawfully discriminatory manner. At the same time, Congress was aware that the small ORS staff might not be able effectively to process all the discrimination complaints it received. It therefore chose to provide private citizens with a remedy in such situations, but that remedy was directed toward the state and local governments which were involved in the discrimination. By this means, and by the use of its oversight powers, Congress sought to establish an enforcement system which would both stop the use of federal funds in discriminatory programs and ensure that the small ORS staff would not be converted into a branch of the Justice Department's Civil Rights Division.

Appellants urge that the balance we believe Congress arrived at has not worked. However, the remedy Congress provided, while perhaps less effective as a broad social reform measure than appellants would desire, is adequate to redress their individual injuries. We therefore reject their attempt to put the courts in a perpetual oversight position with respect to the agency. Because we conclude that appellants have failed to state a legally cognizable claim for relief, the judgment of the district court is

*Affirmed.*

SPOTTSWOOD W. ROBINSON, III, Chief Judge, with whom joined J. SKELLY WRIGHT, WALD, MIKVA and HARRY T. EDWARDS, Circuit Judges, concurring in part and dissenting in part:

Appellants charge the Office of Revenue Sharing (ORS) with virtual abdication of its duty to enforce the nondiscrimination provisions of the Revenue Sharing Act.[1] The gravamen of their claim is that ORS refuses, continually and systematically, to inves-

---

**88.** *Francis-Sobel v. University of Maine,* 597 F.2d 15, 18 (1st Cir.), *cert. denied,* 444 U.S. 949, 100 S.Ct. 421, 62 L.Ed.2d 319 (1979) (emphasis in the original).

1. Officially, this legislation is the State and Local Fiscal Assistance Act, Pub.L. No. 92–512,

86 Stat. 919 (1972), as amended by Pub.L. No. 94–488, 90 Stat. 2341 (1976) (codified as amended at 31 U.S.C. §§ 1221–1265 (1976 & Supp. IV 1980)) [hereinafter cited as Revenue Sharing Act].

tigate administrative complaints of statutory violations, or to implement statutory procedures precipitating funding suspension or cutoff when recipients persist therein. This widespread inaction, appellants contend, amounts to agency renunciation of its statutory responsibilities, remediable only by a judicial order directing ORS to execute the Act's commands.

The court today, concluding that federal law discountenances the relief appellants ask, affirms an outright dismissal of their injunction suit. I think appellants' effort may be sustainable as a class action suitably invoking the Administrative Procedure Act.[2] Accordingly, I would afford them an opportunity to demonstrate that it is.

## I

The Revenue Sharing Act enables state and local governments to share annually in the distribution of billions of federal dollars for use in a great variety of programs. Section 122(a) of the Act, however, bans specified types of discrimination in any project funded wholly or partly through revenue sharing.[3] To implement this proscription, Congress has established procedures requiring ORS[4] to ferret out discrimination by fund recipients and exact compliance with the nondiscrimination edict.[5] These procedures, appellants insist, constantly are ignored by ORS.

The central feature of the Act's enforcement scheme is a triggering mechanism summoning ORS to launch compliance reviews. ORS is instructed to do so upon the occurrence of either of two events. One is the filing with ORS of a complaint alleging that a recipient has discriminated against the complainant.[6] ORS is directed to then

2. Ch. 324, 60 Stat. 237 (1946) (codified as amended in scattered sections of 5 U.S.C.). The relevant provisions are cited and discussed in Part III *infra*.

3. "No person in the United States shall, on the ground of race, color, national origin, or sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity of a State government or unit of local government, which government or unit receives funds made available under subchapter I of this chapter. Any prohibition against discrimination on the basis of age under the Age Discrimination Act of 1975 or with respect to an otherwise qualified handicapped individual as provided in section 794 of title 29 shall also apply to any such program or activity. Any prohibition against discrimination on the basis of religion, or any exemption from such prohibition, as provided in the Civil Rights Act of 1964 or title VIII of the Act of April 11, 1968, hereafter referred to as Civil Rights Act of 1968, shall also apply to any such program or activity." Revenue Sharing Act, *supra* note 1, § 122(a), 31 U.S.C. § 1242(a)(1) (1976). References herein to discrimination are to those types forbidden by that section.

4. The Secretary of the Treasury has assigned to ORS the responsibility for discharging the duties imposed upon him by the Act. 31 C.F.R. § 51.1 (1981).

5. As originally adopted in 1972, the Revenue Sharing Act authorized the Secretary to seek compliance through administrative action of several kinds, including cutoff of funds and referral of violations to the Attorney General for civil suit. Revenue Sharing Act, *supra* note 1, § 122(b), 86 Stat. 932 (1972). The 1972 Act empowered the Attorney General to sue recipients engaged in a pattern or practice of discrimination, *id.* § 122(c), 86 Stat. 932, but did not confer a private right of action for discriminatory use of shared revenues. At least one federal court, however, entertained citizen suits endeavoring to redress infringements of § 122(a), perceiving a cause of action under § 10 of the Administrative Procedure Act, 5 U.S.C. § 706 (1976), and resting jurisdiction upon 28 U.S.C. § 1331 (1976). See note 20 *infra*.

Deeply troubled by the general ineffectiveness of § 122, as it then stood, as the medium for eradicating discrimination, Congress revised the section in 1976 to "improve enforcement at the Federal level, to provide better coordination among federal, state, and local civil rights agencies and to ensure that recipients [would] not be subject to conflicting enforcement standards." H.R.Rep. No. 1165, 94th Cong., 2d Sess. 12–13 (1976) [hereinafter cited as House Report]. A prime factor in this decision was recognition that the Secretary had not sufficiently utilized his discretionary authority to secure compliance with the Act's nondiscrimination provisions. *Id.* at 12, 94, 97. During the course of the 1976 amending process, the Act's enforcement procedures assumed their present form.

6. Revenue Sharing Act, *supra* note 1, §§ 124(d), 125(1), 31 U.S.C. §§ 1244(d), 1245(1) (1976).

conduct an investigation, and to make a preliminary ruling on the charge within 90 days.[7] If ORS finds it "more likely than not" that Section 122(a) has been violated, a notice of noncompliance must be sent to the recipient within ten days.[8] Within 30 days after notice has been given, ORS must suspend revenue-sharing payments unless the recipient enters into a compliance agreement or requests a hearing with respect to the accusation.[9]

The second situation in which the Act enjoins ORS to proceed is receipt of notice by ORS of a finding by another administrative agency or a court that a revenue sharer has engaged in discrimination. Thereupon, ORS must pursue a similar course. A notice of noncompliance must be transmitted to the offender within ten days,[10] and ORS must suspend payments within 30 days unless the offender enters into a compliance agreement or asks for a hearing.[11]

Appellants seek judicial correction of an asserted refusal by ORS to obey these statutory commands, and proffer eleven specific incidents as illustrative of repeated and pervasive derelictions of duty.[12] They claim

7. *Id.* § 125, 31 U.S.C. § 1245 (1976). If ORS does not issue a determination within the 90-day period, or if it determines that a recipient has "not failed to comply" with the nondiscrimination mandate, the aggrieved citizen is deemed to have exhausted his administrative remedies and is empowered to bring a civil action. *Id.* § 124(d), 31 U.S.C. § 1224(d) (1976).

8. *Id.* § 122(b)(1), (c)(4), 31 U.S.C. § 1242(b)(1), (c)(4) (1976).

9. *Id.* § 122(b)(2), 31 U.S.C. § 1242(b)(2). At this hearing, the recipient may dispute the agency's preliminary finding. *Id.* The administrative law judge conducting the hearing may affirm or reverse the initial ORS decision after complete review of the evidence, and must rest his findings upon the entire record. 31 C.F.R. § 51.66 (1981).

10. Revenue Sharing Act, *supra* note 1, § 122(b)(1), 31 U.S.C. § 1242(b)(1) (1976).

11. *Id.* § 122(b)(2), § 1242(b)(2). The procedure here differs from that activated by a citizen complaint. See text at notes 6–9 *supra*. A revenue sharer whose practices have been condemned by a "holding," as described in § 122(c)(1), 31 U.S.C. § 1242(c)(1) (1976), may not relitigate the question of discrimination before ORS. Revenue Sharing Act, *supra* note 1, § 122(b)(2)(A), (c)(2), 31 U.S.C. § 1242(b)(2)(A), (c)(2) (1976). The only issue the recipient can raise is "whether the program or activity in connection with which [an] exclusion, denial, discrimination, or violation is charged has been funded in whole or in part with funds made available under" the Act. *Id.* § 122(b)(2)(B), 31 U.S.C. § 1242(b)(2)(B) (1976).

12. In their amended complaint, appellants cited eleven incidents of alleged ORS inaction. In five of these instances, appellants charge, ORS was notified of federal district court findings of discrimination in programs funded by revenue sharing, but neither sent notices of noncompliance to the localities implicated as required by § 122(b)(1), 31 U.S.C. § 1242(b)(1) (1976), nor instituted fund-suspension proceedings as mandated by § 122(b)(2), 31 U.S.C. § 1242(b)(2) (1976). See Amended Complaint ¶ 27, Joint Appendix (J.App.) 36, referring to *Pennsylvania v. O'Neill*, 348 F.Supp. 1084 (E.D.Pa.), *aff'd in part and vacated in part,* 473 F.2d 1029 (3d Cir.1972) (hiring practices of Philadelphia police department found racially discriminatory), and to *Pennsylvania v. Rizzo*, 9 EPD ¶ 9891 (E.D.Pa.1975) (employment procedures of Philadelphia fire department found racially discriminatory); Amended Complaint ¶ 36, J.App. 38, referring to *United States v. City of Milwaukee*, 441 F.Supp. 1371 (E.D.Wis.1977) (pay practices of city found discriminatory on basis of sex); Amended Complaint ¶ 37, J.App. 38, referring to *Crockett v. Green*, 388 F.Supp. 912 (E.D.Wis.1975), *aff'd*, 534 F.2d 715 (7th Cir. 1976) (employment practices of city found racially discriminatory); Amended Complaint ¶ 50, J.App. 40, referring to *United States v. San Diego Cty.*, 20 EPD ¶ 3,154 (S.D.Cal.1979) (promotional practices maintained by sheriff's department found discriminatory on basis of race, sex and national origin).

At present, however, no party to any of these five incidents remains in this case. Three plaintiff organizations earlier challenging ORS' noncompliance with § 122(b), 31 U.S.C. § 1242(b) (1976), have dropped out. Of these, two Milwaukee plaintiffs, the Northside Community Design Center, a minority urban planning association, and the Latin American Association for Civil Rights, Inc., an organization created to advance the interests of the Spanish-speaking community, Amended Complaint ¶ 7, J.App. 29, which protested ORS' refusal to act upon receipt of federal-court findings of discrimination in the city, *id.* ¶¶ 35–37, J.App. 38, are not parties to this appeal. See Brief for Appellants at 1 (D.C.Cir. Rule 8(c) certificate). Similarly, the third of these organizational plaintiffs, Casa Justicia, which had represented

that ORS habitually fails to respond to administrative complaints, press for compliance agreements, cut off funds or impose other sanctions on recipients flouting the Act. They contend that these inactions are judicially reviewable under the Revenue

Sharing Act, and under the Administrative Procedure Act as well.

The District Court, ruling on appellees' motion to dismiss, concluded that "in view of the purposes of the nondiscrimination

persons affected by the judicial finding of discrimination in the San Diego County's sheriff's department, see Amended Complaint ¶ 50, J.App. 40, is, on its own motion for voluntary dismissal, see Fed.R.App.P. 41(b), no longer in the case. Another organization, appellant Council of and for the Blind, protests ORS' failure to send notices of noncompliance to the City of Philadelphia in the two instances cited. The difficulty, however, is lack of any indication that Council or any of its constituents was involved in or affected by either of those two incidents; thus Council may have no standing to attack them. See Majority Opinion (Maj. Op.) at n. 67. Nor is Council a member of the class—those who have filed administrative complaints with ORS, see note 39 *infra*,—that might be able to litigate ORS' alleged deficiencies in the handling of such complaints. Accordingly, Council's claim of dereliction on ORS' part following notification of discrimination findings by other tribunals may not properly belong in the case.

Appellants do allege, however, that some of them have filed administrative complaints charging five revenue-sharing recipients with prohibited discrimination, and that similar charges have been filed on their behalf against one additional recipient, and that none of these grievances has received the consideration required by the Act. Appellants so involved are appropriate members of the class I deem possibly qualified to maintain this action against ORS for relief from statutory infringements in the processing of discrimination complaints. See text *infra* at notes 36–44.

In that context, the pertinent allegations are that ORS' failure to fulfill its statutory obligations has manifested itself in three forms. First, appellants claim that ORS has elected not to initiate the investigations required by § 125, 31 U.S.C. § 1245 (1976). See Amended Complaint ¶¶ 40–41, J.App. 38, (administrative complaint filed by Operation Push in May, 1974, against the City of Memphis, Tennessee, alleging that the city maintained racially discriminatory employment practices); *id.* ¶¶ 53–54, J.App. 40 (administrative complaint filed by NAACP Yuba Sutter Chapter, J. Magdaleno Bottello and Eugene Elvertt Fields on December 3, 1975, asserting that Sutter County, California, engaged in employment practices which discriminate on the basis of race, national origin and sex). Operation Push, NAACP Yuba Sutter Chapter, J. Magdaleno Bottello and Eugene Elvertt Fields are appellants here. *Id.* ¶ 8, J.App. 6; *id.* ¶ 12, J.App. 30.

Appellants further assert that in two instances ORS, upon receipt of citizen complaints, conducted a compliance review resulting in a determination that the recipient had transgressed the Act, but failed to secure a compliance agreement or impose sanctions as demanded by § 122(d)(2), 31 U.S.C. § 1242(d)(2) (1976). See Amended Complaint ¶¶ 42–47, J.App. 39–40, referring to a complaint filed by El Pueblo Unido on December 3, 1975, against the City of Santa Maria, California, charging that the city engaged in employment practices which discriminate against blacks, Mexican-Americans and women. ORS conducted a compliance investigation on April 21–22, 1977, and determined the locality was out of conformity with the Act, but took no action against the city to cut off funds or to secure a compliance agreement. *Id.* ¶¶ 43–47, J.App. 38–40. ORS answered that fourteen months subsequently it found the city to be in compliance. See Answer to Amended Complaint ¶ 44, J.App. 60. See also Amended Complaint ¶¶ 59–61, J.App. 41, referring to a complaint filed by Concerned Citizens for Equal Employment alleging that San Luis Obispo County, California, on November 12, 1975, followed a practice of employment discrimination against blacks, Mexican-Americans, Spanish-surnamed persons and women. Pursuant to an April 20, 1977, compliance review, ORS found the county to be in violation of the Act. The amended complaint, ¶ 61, J.App. 41, alleges that no compliance agreement was ever executed between the county and ORS nor were any sanctions imposed; ORS in its answer, ¶ 61, J.App. 60, denies this charge. El Pueblo Unido and Concerned Citizens for Equal Employment also are appellants here. Amended Complaint ¶ 9, J.App. 29–30; *id.* ¶ 13, J.App. 31.

Appellants also claim that in two additional instances compliance investigations were initiated after citizen complaints were filed, but were terminated without any findings by ORS and without any compliance agreement or sanctions. See *id.* ¶¶ 55–56, J.App. 41 (complaint filed by Ernest Laredo, on behalf of the Tulare County Tenants' Union, alleging that Tulare County, California, engaged in a pattern and practice of employment discrimination against minorities); *id.* ¶¶ 57–58, J.App. 41 (complaint filed by the Chicano Taxpayers Association asserting that the City of Oceanside, California, engaged in discriminatory employment practices). The Tulare County Tenants' Union and the Chicano Taxpayers Association likewise are appellants here. *Id.* ¶¶ 11, 14, J.App. 30–31.

provision of the Revenue Sharing Act, the private remedy in section [124] [13] undeniably provides an adequate remedy in court for each plaintiff's individual grievances." [14] On this basis, the court held that appellants had not stated any cause of action under the Administrative Procedure Act, [15] the mandamus statute [16] or the Due Process Clauses of the Constitution. [17] This position is now endorsed by a majority of my colleagues.

I agree with the majority that the Revenue Sharing Act does not confer a cause of action of the type framed by appellants. Congress designed the statutory grievance and judicial-review procedures to accommodate claims pressed individually. [18] I conclude, like my colleagues, that Congress, in developing this comprehensive plan for administrative investigation and resolution of situation-specific complaints and for subsequent judicial review, [19] did not intend to create thereby a new right of action chal-

**13.** Revenue Sharing Act, *supra* note 1, § 124, 31 U.S.C. § 1244 (1976).

**14.** *Council of and for the Blind v. Regan,* No. 76–0467, (D.D.C. Feb. 4, 1981) (memorandum and order) at 12–13.

**15.** *Id.* at 13.

**16.** *Id.* at 13, 14 n. 20, referring to 28 U.S.C. § 1361 (1976).

**17.** *Council of and for the Blind v. Regan, supra* note 14, at 14–15.

**18.** As the Supreme Court has emphasized, implication of a private right of action is a matter of statutory construction, and "what must ultimately be determined is whether Congress intended to create the private remedy asserted." *Transamerica Mortgage Advisors v. Lewis,* 444 U.S. 11, 15–16, 100 S.Ct. 242, 245, 62 L.Ed.2d 146, 152 (1979) (private cause of action for damages not to be implied from § 206 of the Investment Advisors Act of 1940); see *Touche Ross & Co. v. Redington,* 442 U.S. 560, 567, 99 S.Ct. 2479, 2484–2485, 61 L.Ed.2d 82, 90 (1979) (no private right of action implied from § 17(a) of the Securities Act of 1934 for damages attributable to accountants' misstatements in reports); *National R.R. Passengers Corp. v. National Ass'n of R.R. Passengers,* 414 U.S. 453, 458, 94 S.Ct. 690, 693, 38 L.Ed.2d 646, 652 (1964) (express language of section of the Amtrak Act, interpreted in light of its legislative history and the whole Act, provides exclusive remedies, and no additional private cause of action is to be implied). The Court has cautioned judges against looking abstractly at the desirability of inferring private causes of action in efforts to effectuate the supposed purposes of a given statute. *Merrill Lynch, Pierce, Fenner & Smith v. Curran,* 456 U.S. 353, 378–382, 102 S.Ct. 1825, 1839–1841, 72 L.Ed.2d 182, 201–203 (1982).

Nondiscrimination provisions were inserted into the original Revenue Sharing Act in 1972 as a guaranty that the Federal Government will not subsidize discriminatory conduct in state or local programs through allocations of revenue-sharing monies. *Council of and for the Blind v. Regan, supra* note 14, at 11, citing House Report, *supra* note 5, at 12; S.Rep. No. 1207, 94th Cong., 2d Sess. 2627, *reprinted in* 1976 U.S. Code Cong. & Ad.News 5176–5177 [hereinafter cited as Senate Report]. Finding ORS' enforcement of these provisions unsatisfactory, Congress, in 1976, established § 122's elaborate machinery for compliance investigations and review at the agency level. See notes 6–11 *supra* and accompanying text. Still wary, however, because of ORS' past failures, Congress armed private parties for the eventuality that ORS might not respond affirmatively in a timely manner to an administrative complaint challenging discriminatory practices of a funded unit. See H.R.Rep. No. 1720, 94th Cong., 2d Sess. 37, *reprinted in* 1976 U.S.Code Cong. & Ad.News 5205 [hereinafter cited as Conference Report]; Senate Report, *supra,* at 34, *reprinted in* 1976 U.S.Code Cong. & Ad.News 5184; 122 Cong.Rec. 29904, 29906, 29909 (1976) (remarks of Senators Long and Brooke). The weapon Congress supplied is § 124, 31 U.S.C. § 1244 (1976), conferring a citizen remedy enabling individuals and organizations to sue any locality using shared revenues in a discriminatory manner. In its most relevant part, that section provides:

> Whenever a State government or a unit of local government, or any officer or employee thereof acting in an official capacity, has engaged or is engaging in any act or practice prohibited by this chapter, upon exhaustion of administrative remedies, a civil action may be instituted by the person aggrieved in an appropriate United States district court or in a State court of general jurisdiction.

Revenue Sharing Act § 124(a), 31 U.S.C. § 1244(a) (1976).

**19.** Section 124 actions can, of course, be brought against the fund recipient. See note 18 *supra.* This section does not expressly provide that ORS can be joined as a defendant when the relief sought is suspension or termination of the recipient's funding. See § 124(a), 31 U.S.C. § 1244(a) (1976), quoted *supra* note 18. The District Court construed § 124 to permit such joinder, to enable the framing of an effective suspension or termination order. See *Council of and for the Blind v. Regan, supra*

lenging ORS' overall response to that plan.[20] But, unlike the majority, I do not believe the inquiry properly ends at this point.

note 14, at 3 n. 3. On appeal, ORS does not contest this interpretation, and my colleagues affirm that limited participation. See Maj.Op. at note 68. I agree that, insofar as § 124 suspension-termination actions are concerned, the congressionally-intended role for ORS is that of a nominal defendant for that purpose. See, however, note 20 *infra.*

**20.** Individual actions pursuant to § 124, confined as they are to individual grievances, cannot provide adequate redress for the systemic breakdowns appellants allege. See Part III *infra.* Nonetheless, culmination of an injury to but one appellant—ORS' failure to act on a particular complaint—cannot alone confer standing on appellants to challenge ORS' conduct as representatives of a class. See Part II *infra.* Appellants can press their bid for relief from ORS' alleged systemic failures only if they can qualify as representatives of a class of similarly harmed persons protected by § 122(a). See Part II *infra.*

This does not, however, foreclose institution of an action against ORS, as sole defendant, for refusing in a particular instance to comply with the commands of § 122(b)(1), 31 U.S.C. § 1242(b)(1) (1976). By this provision, Congress explicitly ordered ORS to send a notice of noncompliance to a funded unit within ten days of receipt of notice of a holding of discrimination by another tribunal, or of the making of a similar finding by ORS, against the revenue sharer. These directives cannot be deemed merely precatory, and if ORS ignores them § 124(a), 31 U.S.C. § 1244(a) (1976), empowers an aggrieved private party to bring suit against ORS alone to compel it to proceed against the local unit targeted in the "holding," as defined in § 122(c)(1), 31 U.S.C. § 1242(c)(1) (1976), or in the "finding," as described in § 122(c)(4), 31 U.S.C. § 1242(c)(4) (1977). Section 124 injunctive relief of this type against the agency would only lie in these two instances, and once ORS proceeds as the Act specifically directs, private parties could not pursue this injunctive route further. For example, if the plaintiff believes a compliance agreement is inadequate, his only § 124 recourse is a suit against the locality allegedly discriminating, with ORS joined as a nominal defendant.

Examination of the legislative history of the 1976 amendments fortifies this position. In amending the 1972 Act, Congress recognized a major deficiency in § 124. See note 5 *supra.* The House Committee on Finance acknowledged that ORS had "inadequately used [its] discretionary authority to enforce the nondiscrimination provision," House Report, *supra* note 5, at 12, and recommended a means of securing more effective enforcement of the embargo on discriminatory use of revenue-sharing funds:

By establishing a set of compliance procedures resulting in the mandatory suspension of revenue sharing payments should proven discrimination persist, the Committee has ensured that the laxity of the Office of Revenue Sharing in enforcing the nondiscrimination requirement of the Act shall not be permitted to continue. Local governments will no longer be able to evade civil rights enforcement through slick accounting devices in reporting the use of revenue sharing funds. Individuals submitting complaints alleging civil rights violations will no longer have to wait many months or even years before receiving a response from the Office of Revenue Sharing. *Id.* at 94.

Congress adopted this approach, coupling nondiscretionary enforcement procedures with a provision conferring a citizen remedy. The House Report noted that the 1972 Act did not contain such a provision but that the courts had interpreted original § 124 to enable "private citizens or organizations representing their interests [to] sue the United States or any recipient government for using shared revenues in a discriminatory fashion." *Id.* at 14; see *id.* at 98, 101, 102. The House took pains to point out that "[these] rights . . . continued under the revised section 122." *Id.* at 14.

In explicating that the preexisting judicially-created private action was to be codified in amended § 124, the House repeatedly referred with approval to the citizen remedy utilized in *United States v. City of Chicago*, 395 F.Supp. 329 (N.D.Ill.), *aff'd without opinion*, 525 F.2d 695 (7th Cir.1975). In that case, the plaintiffs sought and obtained court orders prohibiting revenue-sharing payments to a recipient, which had been found in violation of the Act, until its discriminatory practices and policies were abandoned. The action, from commencement through resolution, targeted elimination of agency dereliction. The plaintiffs initiated the process by filing with the Department of the Treasury an administrative complaint against the City of Chicago, alleging that the city was using shared revenues in violation of § 122(a). The Secretary of the Treasury elected not to investigate the charges, whereupon the plaintiffs brought a civil action in the United States District Court for the District of Columbia for an injunction ordering the Secretary to take remedial administrative action against the city aimed at enforcing the statutory proscription against the use of shared funds for racially discriminatory purposes. Contemporaneously with this private action, the Federal Government filed charges against the City of Chicago in the United States District Court for the Northern District of Illinois, charging racial discrimination in the Chicago police department. That court found the city's policies and practices with respect to employment of patrol officers and promotion of sergeants discriminatory

At the forefront of my analysis is "the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."[21] It matters not that the plaintiff cannot prevail on the legal theory he advances; rather, the question is whether he might succeed on any theory.[22] Nor need the plaintiff's case merit the particular relief sought; it suffices that relief of some kind may be warranted.[23] In either event, the plaintiff should be allowed to amend his complaint appropriately,[24] and should be denied that opportunity only if it appears to a certainty that he simply cannot state a valid claim.[25]

That sort of impossibility does not exist here. Reading appellants' complaint in the

on grounds both of race and sex. *United States v. City of Chicago,* 385 F.Supp. 543 (N.D.Ill.1974), *aff'd in part and rev'd in part,* 549 F.2d 415 (7th Cir.1977). The plaintiffs then moved, on the basis of these findings, in the District Court for the District of Columbia to enjoin payment of revenue-sharing funds to the city. That court granted a preliminary injunction ordering withholding of funds scheduled for the city. On motion of the city, the intervenor, the District of Columbia action was transferred to the Northern District of Illinois. 395 F.Supp. at 337. That court continued the preliminary restraint on additional revenue-sharing payments to the city. *Id.* at 342.

Congressional reference to *City of Chicago,* as illustrative of the private right of action preserved by the 1976 amendments, see House Report, *supra* note 5, at 98 n. 3, 102 n. 16, continued within the Conference Committee. Conference Report, *supra* note 18, at 37. This history convinces me that Congress, in revising the Act in 1976, desired to retain this preexisting form of relief, and thus to extend the § 124 remedy to individual actions solely against ORS for refusal to observe the dictates of § 122(b)(1), 31 U.S.C. § 1242(b)(1) (1976). See, *e.g., Morris v. Gressette,* 432 U.S. 491, 500–501, 97 S.Ct. 2411, 2418, 53 L.Ed.2d 506, 516 (1977); *Dunlop v. Bachowski,* 421 U.S. 560, 567, 95 S.Ct. 1851, 1857, 44 L.Ed.2d 377, 387 (1975); *Abbott Laboratories v. Gardner,* 387 U.S. 136, 140, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681, 686 (1967). A superficially related matter must be carefully distinguished, however. I do not subscribe to appellants' position that every time ORS fails to observe the 90-day limit prescribed in § 124(d), 31 U.S.C. § 1244(d) (1976), for investigation and resolution of complaints, the complainant derives the right to sue ORS directly. Congress realized that ORS might not be able to adhere to this timetable, and inserted § 124(d) mainly to temper the exhaustion requirement by allowing private parties to seek relief in court on a more expedited basis. House Report, *supra* note 5, at 15; Senate Report, *supra* note 18, at 34; Conference Report, *supra* note 18, at 37–38. Accordingly, when the grievance is simply that ORS has not met the 90-day deadline, the party's sole recourse is a § 124 action against the recipient, and ORS nominally, for relief from discriminatory activity.

21. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80, 84 (1957). Accord, *Haines v. Kerner,* 404 U.S. 519, 521, 92 S.Ct. 594, 596, 30 L.Ed.2d 652, 654 (1972); *Jenkins v. McKeithen,* 395 U.S. 411, 421–422, 89 S.Ct. 1843, 1849, 23 L.Ed.2d 404, 416–417 (1969) (plurality opinion); *Jones v. Rogers Memorial Hosp.,* 143 U.S.App.D.C. 51, 53, 442 F.2d 773, 775 (1971).

22. *Bonner v. Circuit Court,* 526 F.2d 1331, 1334 (8th Cir.1975), *cert. denied,* 424 U.S. 946, 96 S.Ct. 1418, 47 L.Ed.2d 353 (1976); *United States v. Howell,* 318 F.2d 162, 166 (9th Cir. 1963); *Perington Wholesale v. Burger King Corp.,* 631 F.2d 1369, 1375 n. 5 (10th Cir.1979).

23. *Norwalk CORE v. Norwalk Redev. Agency,* 395 F.2d 920, 925–926 (2d Cir.1968); *Lada v. Wilkie,* 250 F.2d 211, 212–213 (8th Cir.1957); *United States v. Howell, supra* note 22, 318 F.2d at 166.

24. *Shapiro v. Secretary of State,* 162 U.S.App. D.C. 391, 398 & n. 25, 499 F.2d 527, 534 & n. 25 (1974), *aff'd on other grounds sub nom. Commissioner v. Shapiro,* 424 U.S. 614, 96 S.Ct. 1062, 47 L.Ed.2d 278 (1976); *Ballou v. General Elec. Co.,* 393 F.2d 398, 399–400 (1st Cir.1968); *McLaughlin v. Union Switch & Signal Co.,* 166 F.2d 46, 49 (3d Cir.1948); *Bonanno v. Thomas,* 309 F.2d 320, 322 (9th Cir.1962).

25. *Lone Star Motor Import v. Citroen Cars Corp.,* 288 F.2d 69, 77 (5th Cir.1961); *Stebbins v. Weaver,* 537 F.2d 939, 942 (7th Cir.1976), *cert. denied,* 429 U.S. 1041, 97 S.Ct. 741, 50 L.Ed.2d 753 (1977); *Bonanno v. Thomas, supra* note 24, 309 F.2d at 322. Since, save in extreme circumstances, it is unlikely that the court can determine conclusively on the face of a defective pleading whether the plaintiff actually can state a claim, it is wise to allow the amendment. *Schlesinger Inv. Partnership v. Fluor Corp.,* 671 F.2d 739, 742 (2d Cir.1982); *Austin v. House of Vision,* 385 F.2d 171, 172 (7th Cir.1967).

light most beneficial to them[26] and resolving all factual doubts in their favor,[27] they are by no means the sole victims of ORS' asserted inertia.[28] With a presently unknown number of other persons and organizations seemingly similarly situated, it may well be that appellants can meet the preconditions for certification as representatives of a class. It may also be that, as class litigants, they can attack ORS' alleged systemic failure to observe the Act's directives for consideration and disposition of citizen complaints. Thus appellants, as class members, may be able to seek relief of a kind which they cannot hope to obtain as individuals. The majority does not ponder these prospects, nor can they be adequately gauged on the record now before us, but in my view they must be explored and found wanting before it can be said that this case is susceptible to dismissal.

The threshold inquiry is whether there is a plausible basis for assuming that appellants can obtain class certification to protest ORS' systemwide handling of complaints. In the District Court, appellants professed to represent a class composed of "[a]ll Black, Latino-Mexican-American, handicapped persons, women" and their organizational counterparts "who have filed or may file administrative complaints with [ORS] alleging discrimination under Section 122 of the" Act.[29] Deeming this class legally satisfactory,[30] appellants moved for class certification.[31] The District Court denied the motion, without prejudice, on grounds that the proposed class was overbroad in two respects: it included those who have not yet filed complaints with ORS, a group possibly encompassing countless unknown blacks, Latino-Mexican-Americans, handicapped persons, and women; and the named plaintiffs, the court felt, were not adequate representatives of women or the handicapped other than the blind.[32]

Since this ruling was without prejudice, it erects no barrier to reconsideration of the matter of class certification,[33] particularly of a somewhat redefined class.[34] And with that question inextricably bound up with the question of existence of a cause of action,[35] the propriety of dismissing appellants' suit is wholly dependent upon the unavailability of class status. By my estimate, the case for class certification is strong.

**26.** *Jenkins v. McKeithen, supra* note 21, 395 U.S. at 421, 89 S.Ct. at 1849, 23 L.Ed.2d at 416; *Tunnell v. Wiley,* 514 F.2d 971, 975 n. 6 (3d Cir.1975); *Ward v. Hudnell,* 366 F.2d 247, 249 (5th Cir.1966); *Jung v. K. & D. Mining Co.,* 260 F.2d 607, 608 (7th Cir.1958); *Loge v. United States,* 662 F.2d 1268, 1274 (8th Cir.1981), *cert. denied,* 456 U.S. 944, 102 S.Ct. 2009, 72 L.Ed.2d 466 (1982); *McKinney v. De Bord,* 507 F.2d 501, 503–504 (9th Cir.1974).

**27.** *Schuler v. United States,* 199 U.S.App.D.C. 23, 26, 617 F.2d 605, 608 (1979); *Tunnell v. Wiley, supra* note 26, 514 F.2d at 975 n. 6; *Davis H. Elliot Co. v. Caribbean Utils. Co.,* 513 F.2d 1176, 1182 (6th Cir.1975); *Jung v. K. & D. Mining Co., supra* note 26, 260 F.2d at 608; *McKinney v. De Bord, supra* note 26, 507 F.2d at 503.

**28.** See notes 12 *supra,* 48 *infra.*

**29.** Appellants define the class as one composed of "[a]ll Black, Latino-Mexican-American, and handicapped persons, women and organizations made up of such persons and organized for the improvement of the status of the aforementioned persons who have filed or may file administrative complaints with the Office of Revenue Sharing alleging discrimination under section 122 of the State and Local Government Fiscal Assistance Act of 1972, as amended by Public Law 94–462, 31 U.S.C. § 1242." Plaintiffs' Motion for Certification of Class Action ¶ 2a–b, *Council of and for the Blind v. Regan* (filed Aug. 6, 1980), J.App. 67.

**30.** See Fed.R.Civ.P. 23(a), (b).

**31.** See *id.* 23(c)(1).

**32.** *Council of and for the Blind v. Regan* (order and memorandum) (Jan. 9, 1981), Record (R.) 69.

**33.** See *New York, C. & St. L.R.R. v. Vardaman,* 181 F.2d 769, 770 (8th Cir.1950) (dismissal "without prejudice" leaves plaintiff free to bring suit anew); *Kennedy v. State Farm Mut. Auto. Ins. Co.,* 46 F.R.D. 12, 14 (E.D.Ark.1969) (same); *Southern Md. Agricultural Ass'n v. United States,* 16 F.R.D. 100, 102 (D.Md.1954) (same).

**34.** See notes 36–44 *infra* and accompanying text.

**35.** See Part III *infra.*

## II

Surely appellants' suit survives the threshold class-action requirement that a "class" actually exist.[36] Already, as appellants project the class, it would include only those who are within some group protected by Section 122(a) from discrimination,[37] and it readily could, and indeed should, be further narrowed to persons[38] who formally complain of discrimination to ORS.[39] Thus refined, there would be, from a relatively early stage of the case,[40] a class composed only of individuals sharing a right common to themselves and the named plaintiffs,[41]

**36.** See *Alexander v. Gino's, Inc.,* 621 F.2d 71, 74–75 (3d Cir.), *cert. denied,* 449 U.S. 953, 101 S.Ct. 358, 66 L.Ed.2d 217 (1980); *Roman v. ESB, Inc.,* 550 F.2d 1343, 1348 (4th Cir. *en banc* 1976); *Weisman v. MCA, Inc.,* 45 F.R.D. 258, 261 (D.Del.1968); *Dolgow v. Anderson,* 43 F.R.D. 472, 491 (E.D.N.Y.1968).

**37.** Among them are members of "organizations made up of" "Black, Latino-Mexican-American and handicapped persons [and] women" "and organized for the improvement of the status of the afore-mentioned persons." See note 29 *supra.* Members of organizations so constituted are themselves individuals protected by § 122(a).

**38.** This is not to say that all of the groups shielded from discrimination by § 122(a) would necessarily be reflected in the membership of the class. Compare notes 29, 37 *supra.*

**39.** The class envisioned by appellants would encompass not only protected persons "who have filed" discrimination complaints with ORS but also protected persons who later "may file." See note 29 *supra.* This formulation is overbroad to the extent that it contemplates inclusion of those who have yet to file and merely may do so at some unspecified point in the future. See *Mathews v. Diaz,* 426 U.S. 67, 71 n. 3, 96 S.Ct. 1883, 1887 n. 3, 48 L.Ed.2d 478, 485 n. 3 (1976); *Weinberger v. Salfi,* 422 U.S. 749, 763–764, 95 S.Ct. 2457, 2466, 45 L.Ed.2d 522, 537–538 (1975); *Curtis v. Voss,* 73 F.R.D. 580, 582–583 (N.D.Ill.1976). Nonfilers may well be unidentifiable, see text *infra* at note 42, and in any event they cannot lay claim to procedural entitlements which the Act confers solely upon filers. See *Mathews v. Diaz, supra,* 426 U.S. at 71 n. 3, 96 S.Ct. at 1887 n. 3, 48 L.Ed.2d at 485 n. 3; *Curtis v. Voss, supra,* 73 F.R.D. at 582–583.

Indeed, attempted designation of future filers as present class members is entirely unnecessary. As it has been well said,

[m]any class actions involve classes whose membership predictably fluctuates over the course of the litigation. The fact that class membership is fluid, changing as the case progresses, does not negate the suitability of the class action device. *Wallace v. McDonald,* 369 F.Supp. 180, 188 (E.D.N.Y.1973). What is critical is that the class definition be sufficiently precise to enable the court to determine at any given time whether a particular individual qualifies as a class member.

C. Wright & A. Miller, *Federal Practice and Procedure* § 1760 (1972). Consequently, the exclusion of an individual at the time the class is defined does not imply exclusion at the time judgment is entered. Moreover, from a pragmatic viewpoint, the district court is concerned with those who in the future may be class members only to the extent that at some point, their previously hypothetical grievance matures into a claim upon which the requested relief may be granted. When this occurs, the person qualifies as a present class member, even if the class definition is specifically limited to those who have already been injured or threatened with injury by the defendants' conduct. Since the future class members who actually suffer injury thereby become present class members eligible for relief, a definition encompassing future members is superfluous. *Curtis v. Voss, supra,* 73 F.R.D. at 582–583. Thus, appellants would be as well off *without* the words "or may file" in their class definition as they endeavored to become through that addition. And it seems accepted, as *Curtis* holds, that the existence of a class is not affected by the changing character of its membership. *Glover v. Johnson,* 85 F.R.D. 1, 3–4 (E.D. Mich.1977); *Wallace v. McDonald, supra,* 369 F.Supp. at 188; *Baird v. Lynch,* 390 F.Supp. 740, 746 (W.D.Wis.1974).

The overbreadth imparted to appellants' class-designation by their specification of future filers is not fatal to their class-action effort. This flaw in appellants' description of the class is readily curable by judicial redefinition of the class to eliminate those who have yet to complain to ORS. See note 44 *infra* and accompanying text.

**40.** See 3B J. Moore & J. Kennedy, Federal Practice, ¶ 23.04 at 23–114 to 23–119 (2d ed. 1982); 7 C. Wright & A. Miller, Federal Practice, § 1760 at 583–584 (1972).

**41.** See *East Texas Motor Freight Sys. v. Rodriquez,* 431 U.S. 395, 403, 97 S.Ct. 1891, 1896, 52 L.Ed.2d 453, 461–462 (1977); *Schlesinger v. Reservists Comm. to Stop the War,* 418 U.S. 208, 216, 94 S.Ct. 2925, 2930, 41 L.Ed.2d 706, 716 (1974); *Vulcan Soc'y v. Fire Dep't of White Plains,* 82 F.R.D. 379, 398–399 (S.D.N.Y.1979); *Consor v. Occidental Life Ins. Co.,* 469 F.Supp. 1110, 1115 (N.D.Tex.1979). In the instant case, the right is to administrative processing of fil-

with boundaries sufficiently precise to make positive identification of its membership at any given moment administratively feasible.[42] This would, in my view, easily satisfy the initial call for an existing class,[43] and no more than a minor bit of judicial surgery is needed.[44] There remains, of course, the question whether the several prerequisites to class-action litigation are or possibly can be met.

Federal Civil Rule 23(a) permits class certification "only if (1) the class is so numerous that the joinder of all members is im-practicable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class."[45] Early on in the District Court, appellants moved for class certification,[46] but appellees opposed the motion on grounds that appellants' purported class did not satisfy the numerosity, commonality or typicality requirements.[47] The court, in denying certification, held more restrictedly [48]

ers' complaints in the manner commanded by the Act.

**42.** See *Giordano v. Radio Corp. of Am.,* 183 F.2d 558, 560–561 (3d Cir.1950); *DeBremaecker v. Short,* 433 F.2d 733, 734 (5th Cir.1970); *American Servicemen's Union v. Mitchell,* 54 F.R.D. 14, 17 (D.D.C.1972); *Rappaport v. Katz,* 62 F.R.D. 512 (S.D.N.Y.1974).

**43.** Compare *Berman v. Narragansett Racing Ass'n,* 414 F.2d 311, 317 (1st Cir.1969), *cert. denied,* 396 U.S. 1037, 90 S.Ct. 682, 24 L.Ed.2d 681 (1970); *United States v. School Dist.,* 616 F.2d 895, 908–909 (6th Cir.1980); *Alliance to End Repression v. Rochford,* 565 F.2d 975, 976–978 (7th Cir.1977); *Midwest Community Council v. Chicago Park Dist.,* 87 F.R.D. 457, 459–460 (N.D.Ill.1980); *Fowler v. Schwarzwalder,* 351 F.Supp. 721, 723 (D.Minn.1972); *Cruz v. Califano,* 78 F.R.D. 314, 316–317 (E.D.Pa.1978).

**44.** Federal courts possess ample authority to redefine the class to bring it within acceptable limits. *Nix v. Fulton Lodge 2, Int'l Ass'n of Machinists,* 452 F.2d 794, 797 (5th Cir.1971), *cert. denied,* 406 U.S. 946, 92 S.Ct. 2044, 32 L.Ed.2d 332 (1972); *Gibson v. Local 40, Int'l Longshoremen's Union,* 543 F.2d 1259, 1264 (9th Cir.1976); *Taylor v. Safeway Stores,* 524 F.2d 263, 269 (10th Cir.1975); *Curtis v. Voss, supra* note 39, 73 F.R.D. at 582–583; *Farrington v. Adjutant General of Mich.,* 492 F.Supp. 1362, 1367 (W.D.Mich.1980); *Cyr v. Walls,* 439 F.Supp. 697, 703–705 (N.D.Tex.1977). Similarly, the plaintiff may be allowed to amend in order to reconstruct the class. *DeBremaecker v. Short, supra* note 42, 433 F.2d at 735; *Warner v. First Nat'l Bank,* 236 F.2d 853, 858 (8th Cir.), *cert. denied,* 352 U.S. 927, 77 S.Ct. 226, 1 L.Ed.2d 162 (1956); *Harris v. Palm Springs Alpine Estates,* 329 F.2d 909, 913 (9th Cir. 1964).

**45.** Fed.R.Civ.P. 23(a). All four of these prerequisites must be met. *Huff v. N.D. Cass Co.,* 485 F.2d 710, 712 (5th Cir. *en banc* 1973); *Jordan v. County of Los Angeles,* 669 F.2d 1311, 1318 (9th Cir.), *vacated on other grounds,*

—— U.S. ——, 103 S.Ct. 35, 74 L.Ed.2d 48 (1982). Beyond that, before certifying the class, the court must ascertain whether the further requirements specified in Rule 23(b) are satisfied.

**46.** See Plaintiffs' Motion for Certification of Class Action, *supra* note 29, J.App. 67.

**47.** See Defendants' Opposition to Plaintiffs' Motion for Class Certification, *Council of and for the Blind v. Regan* (filed Sept. 10, 1980), J.App. 120–139.

**48.** The District Court did not address the numerosity and common-question demands of Rule 23(a)(1) and (2). The apparent explanation is that the court saw no reason to do so. I readily agree that neither of these two requirements poses an obstacle to certification, particularly of the class as I would redefine it. See note 39 *supra* and accompanying text.

Numerosity is designed "'to prevent members of a small class from being unnecessarily deprived of their rights without a day in court' by the opposing parties or by only a few members of the class resorting to Rule 23." 7 C. Wright & A. Miller, *supra* note 40, § 1762 at 593, quoting *Rippey v. Denver United States Nat'l Bank,* 260 F.Supp. 704, 712 (D.Colo.1966). Numerosity also fosters the interest of the court in assuring a full and fair exposition of views by all affected parties when it is practicable to join them in a single proceeding. Although the absolute number of class members is not the sole determining factor, joinder will usually be impracticable when the class is large. See 3B J. Moore & J. Kennedy, *supra* note 40, ¶ 23.05[1]. In determining the practicability of joinder, courts have considered, in addition to size of the class, the geographical diversity of class members, the ability of individual claimants to institute separate suits and the type of relief sought. See 1 H. Newburg, Class Actions § 1105 (1977).

The class amenable to representation here would consist of black and Hispanic persons,

that appellants' claims were not typical of the class, and that appellants would not represent the class adequately because their injuries differed from those of the other members of the class.[49] These conclusions, I believe, are open to serious question.[50]

women, and handicapped persons who have filed an administrative complaint alleging discrimination by a recipient of revenue sharing. See note 39 *supra* and accompanying text. There are at least 39,000 recipients, scattered over all fifty states, participating in the revenue sharing program. Amended Complaint ¶¶ 15, 17, 20, J.App. 31, 32, 34. Appellants allege that ORS has a backlog of 500 to 800 discrimination complaints outstanding. *Id.;* Plaintiffs' Motion for Class Certification, *supra* note 29, J.App. 80. Given the large number of recipients and the substantial volume of pending complaints, appellants anticipate that the class potentially includes *several hundred if not thousands of* persons. *Id.,* J.App. 79–82. Classes with similarly large memberships frequently have been certified. *Almenares v. Wyman,* 453 F.2d 1075, 1080 (2d Cir.1971), *cert. denied,* 405 U.S. 944, 92 S.Ct. 962, 30 L.Ed.2d 815 (1972) (all New York State recipients of public assistance benefits); *Eisen v. Carlisle & Jacqueline,* 391 F.2d 555, 562 (2d Cir.1968) (3,750,000 potential class members, in every state and in almost every foreign country); *Wolkenstein v. Reville,* 539 F.Supp. 87, 89 (S.D.N.Y.), *aff'd,* 694 F.2d 35 (2nd Cir.1982) (3,000 members); *Kendler v. Federated Dep't Stores,* 88 F.R.D. 688, 691 (S.D.N.Y.1981) (1.9 million customers).

Although numerosity seems apparent here, simply from the number of class members expected, there are other indicia of impracticability. The proportionate size of each class member's claim is apt to be relatively small. Class members are geographically dispersed, and perhaps difficult to locate. These two factors combine to make it impracticable for class members individually to *join in the suit as* named plaintiffs. See *Harriss v. Pan Am. World Airways,* 74 F.R.D. 24 (N.D.Cal.1977); *Marshall v. Electric Hose & Rubber Co.,* 68 F.R.D. 287 (D.Del.1975). The class will expand as presently unnamed and unknown persons and organizations file administrative complaints in the future. See note 39 *supra.* Joinder of unknown individuals or organizations, of course, is inherently impracticable. See *Scott v. University of Delaware,* 601 F.2d 76, 85–86 (3d Cir.1979); *Jack v. American Linen Supply Co.,* 498 F.2d 122 (5th Cir.1974).

Rule 23(a)(2) also requires a question of law or fact common among the membership of the class. Not every such question need be common to every member of the class, however. See *Mosley v. General Motors Corp.,* 497 F.2d 1330, 1334 (8th Cir.1974); *Fox v. Prudent Resources Trust,* 69 F.R.D. 74, 78 (E.D.Pa.1975);

The central inquiry in determining whether a proposed class has Rule 23(a)(3) typicality is whether the "class representative [is] part of the class and 'possess[es] the same interest and suffers the same injury' as the class members." [51] The demand for

*Cottrell v. Virginia Elec. Power Co.,* 62 F.R.D. 516, 519–520 (E.D.Va.1974). Commonality is to be found "where the question of law linking the class members is substantially related to the resolution of the litigation even though the individuals are not identically situated." *E.g., American Fin. Sys. v. Harlow,* 65 F.R.D. 94, 107 (D.Md.1974). Even if appellants were to represent everyone who has filed a discrimination complaint with ORS, the question, common to all class members, would be whether ORS has adopted a policy or pursues a practice in derogation of its statutory responsibility to curb discriminatory conduct by those receiving revenue-shared monies. While the fact patterns underlying individual grievances naturally differ, the common claim of class members, on the basis of appellants' allegations, would be that ORS does not process their administrative complaints as prescribed by law. *Bermudez v. Department of Agriculture,* 348 F.Supp. 1279, 1280 (D.D.C.1972), *aff'd,* 160 U.S.App.D.C. 150, 158, 490 F.2d 718, 725, *cert. denied,* 414 U.S. 1104, 94 S.Ct. 737, 38 L.Ed.2d 559 (1973); *Eisen v. Carlisle & Jacqueline, supra,* 391 F.2d at 555; *Johnson v. Georgia Highway Express,* 417 F.2d 1122, 1124 (5th Cir.1969).

**49.** *Council of and for the Blind v. Regan, supra* note 14, at 2–4.

**50.** The District Court's order denying certification was not appealed because that action was taken expressly without prejudice. See *Council of and for the Blind v. Regan, supra* note 32, R. 71. Class certification, however, is indispensable to the existence of the cause of action appellants wish to pursue. See Part III *infra.* The District Court did not consider whether appellants could maintain the action as representatives of a class, and my thesis is that the case should be remanded to enable the court to do so. For that reason, I comment on the grounds assigned by the court when initially it declined to certify. See *Payne v. Travenol Laboratories,* 673 F.2d 798, 807–808 (5th Cir.1982); *Jenkins v. Blue Cross Mut. Hosp. Ins.,* 538 F.2d 164 (7th Cir. en banc 1976), *cert. denied,* 429 U.S. 986, 97 S.Ct. 506, 50 L.Ed.2d 598 (1978).

**51.** *East Texas Motor Freight Sys. v. Rodriguez, supra* note 41, 431 U.S. at 403, 97 S.Ct. at 1896, 52 L.Ed.2d at 461–462 (1977), quoting *Schlesinger v. Reservists Comm. to Stop the War, supra* note 41, 418 U.S. at 216, 94 S.Ct. at 2930, 41 L.Ed.2d at 716.

typicality is designed to assure that the representative's interests are aligned with those of the class; with such concord, a named plaintiff litigating his or her own interests necessarily is litigating the interests of the class. In this respect, typicality is closely related to the Rule 23(a)(2) call for some common question of law or fact, and to the Rule 23(a)(4) requirement that the representative adequately protect the interests of absent class members.

A named plaintiff's claims are typical of the class when there is a nexus between the injury sustained by that plaintiff and the injury suffered by the class.[52] Thus the representative's claim is typical if it stems from the same event, practice or course of conduct that forms the basis of the class claim and is to be litigated on the same legal theory.[53] That, I think, rather plainly is the case here. Appellants allege injury from ORS' systemic refusal to address grievances presented administratively. If appellants are factually correct, they share a single type of harm inflicted upon everyone in a class composed of those who have filed administrative complaints with ORS. Clearly, appellants' claims and those of other actual filers would emanate from the same administrative practice, and would be redressable, if at all, through the same legal technology.[54]

I realize that normally the District Court's evaluation of typicality commands considerable deference for the substantial degree of discretion it incorporates.[55] But where, as here, a denial of class certification virtually assures eventual dismissal of the plaintiff's substantive claim, the ambit of judicial discretion is necessarily constricted by the limitations on the court's power to dismiss, and the court's concomitant duty to permit litigants to rescue distressed lawsuits whenever possible.[56] In that context, the court must resort to its authority to reshape the contours of the litigation[57] to allow class treatment of meritorious claims that can be mounted only on a class basis.[58]

---

52. E.g., Long v. Sapp, 502 F.2d 34, 42–43 (5th Cir.1974).

53. Stastny v. Southern Bell Tel. & Tel. Co., 628 F.2d 267, 277 (4th Cir.1980); Wells v. Ramsay, Scarlett & Co., 506 F.2d 436, 437 (5th Cir.1975); Penn v. San Juan Hosp., 528 F.2d 1181, 1189 (10th Cir.1975); Smith v. Baltimore & O.R.R., 473 F.Supp. 572, 581 (D.Md.1979). See also 1 H. Newburg, supra note 48, § 1115.

54. Appellants also attempted to represent persons and organizations who have not filed but might file an administrative complaint. See note 29 supra. As to these persons, I agree with the District Court that the required nexus of claims is not present. See also notes 52–53 supra and accompanying text.

55. See DeGrace v. Rumsfeld, 614 F.2d 796, 809 n. 12 (1st Cir.1980); Paton v. LaPrade, 524 F.2d 862, 875 (3d Cir.1975); McGowan v. Faulkner Concrete Paper Co., 659 F.2d 554, 559 (5th Cir.1981); Yamamoto v. Omiya, 564 F.2d 1319, 1325 (9th Cir.1977).

56. See text supra at notes 21–25.

57. See note 44 supra.

58. In an analogous context, courts have held that discretion in determining whether a suit brought under Title VII of the Civil Rights Act of 1964 will proceed as a class action is tightly constrained by the broad remedial purposes of that legislation. Statsny v. Southern Bell Tel. & Tel. Co., supra note 53, 628 F.2d at 273; Jordan v. County of Los Angeles, supra note 45, 669 F.2d at 1318–1319; Gay v. Waiters' & Dairy Lunchmen's Union, 549 F.2d 1330, 1334 (9th Cir.1977). In the Title VII context, named plaintiffs alleging an identifiable employment pattern, practice or policy of discrimination often assert that demonstrably it affects a great number of persons in substantially comparable ways. In order to determine whether Rule 23 criteria have been met in such actions, courts must to some extent probe the merits:

> For to answer the procedural questions— whether there is a sufficiently homogeneous class vis-a-vis an identified practice to permit binding or benefiting it by class judgments; whether the issues presented in respect of the putative class members' claims have sufficient commonality to permit their resolution on an unindividualized basis; whether the individual claim of a representative plaintiff is sufficiently "typical" to permit its use as the prototype for resolution of the common claims of the class; and whether, given the nature of the representative's claim, adequate representation of class members' claim can be assured from the representative's efforts—in effect requires answering the substantive question whether . . . there exists the requisite "pattern or practice" sufficiently and comparably affecting an identifiable class of protected employees.

Stastny v. Southern Bell Tel. & Tel. Co., supra note 53, 628 F.2d at 274.

Had the District Court struck the one offending clause in appellants' class definition[59] and limited the class to those who file complaints with ORS, its evaluation of appellants' cause of action could have proceeded along entirely different lines.[60]

The other class-related problem addressed by the District Court is whether appellants can serve adequately as class representatives. The general thrust of the court's adverse certification ruling was that appellants lack sufficient unity of interests with two of the groups—women, and those with handicaps other than blindness—included within the proposed class. Rule 23(a)(4) ensures that representative parties will fairly and adequately protect the interests of the entire class, and there is some conflict of authority among the circuits concerning the degree of similarity of interests and injuries needed between class representatives and class members.

Some courts allow the representative to launch an "across-the-board"[61] attack on

As the Supreme Court has recently observed, "suits alleging . . . discrimination are often by their very nature class suits involving class-wide wrongs." *General Tel. Co. v. Falcon,* 457 U.S. 147, 157, 102 S.Ct. 2364, 2370, 72 L.Ed.2d 740, 750 (1982). In this setting, the class-action inquiry may well be intertwined inextricably with the inquiry on existence or nonexistence of a claim for which relief can be granted. See Part III *infra.*

Better it is, in any sort of case, to utilize class certification liberally when suit-dismissals would chance the loss of a meritorious claim forever. Should the soundness of the determination on class-action status be later drawn into question, see *Huff v. N.D. Cass Co., supra* note 45, 485 F.2d at 714, Rule 23 itself suggests a ready means for handling the problem. Rule 23(c)(1) provides that the determination "may be conditional, and may be altered or amended before the decision on the merits." Should, then, it turn out that a class certification possibly was in some wise improvident, the court may reexamine the class structure and conform it to acceptable limits.

**59.** See note 39 *supra* and accompanying text.

**60.** This assumes, of course, that appellants are adequate class representatives, a matter about to be discussed.

**61.** The across-the-board approach would permit a plaintiff presenting a particularized claim of injury, such as racial discrimination, to represent a class composed of all persons aggrieved by the defendant's discriminatory practices of any kind. The named plaintiff thus may adequately represent the class although all of its members do not suffer from the identical form of discrimination; factual variations in types or modes of discrimination normally will not preclude class action treatment.

This technique has been used most commonly in Title VII actions. The Supreme Court, in *General Tel. Co. v. Falcon, supra* note 58, has recently endorsed its application to class-action litigation but has stressed the continuing need for commonality. 457 U.S. at 157–60, 102 S.Ct. at 2370–2372, 72 L.Ed.2d at 750–752. It has been applied to allow an employee complaining of racial discrimination to represent other victimized employees as well as persons denied employment on racial grounds. *Phillips v. Joint Legislative Comm.,* 637 F.2d 1014, 1024 (5th Cir.1981), *cert. denied,* 456 U.S. 960, 102 S.Ct. 2035, 72 L.Ed.2d 483 (1982); *Long v. Sapp, supra* note 52, 502 F.2d at 42; *Dickerson v. United States Steel Corp.,* 439 F.Supp. 55, 59, 61–62 (E.D.Pa.1977). Similarly, an employee who has been promoted or transferred but who asserts injury as a result of the employer's discriminatory practices may represent those employees who have been denied those benefits. *Chisholm v. United States Postal Servs.,* 665 F.2d 482, 494 (4th Cir.1981); *Stastny v. Southern Bell Tel. & Tel. Co., supra* note 53, 628 F.2d at 278–279. When the plaintiff charges that the defendant's employment practices are racially discriminatory as they apply to black employees, he has been held entitled to represent all employees aggrieved by those practices even though some class members have not been engaged in the same work as his. *Johnson v. Georgia Highway Express, supra* note 48, 417 F.2d at 1124; *Jordan v. County of Los Angeles, supra* note 45, 669 F.2d at 1322; *Rich v. Martin-Marietta Corp.,* 522 F.2d 333, 340 (10th Cir.1975). Courts have permitted discharged employees to represent themselves and current employees in assaults on discriminatory employment practices. *Wetzel v. Liberty Mut. Ins. Co.,* 508 F.2d 239, 247 (3d Cir.), *cert. denied,* 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1975); *Jenkins v. Blue Cross Mut. Hosp. Ins., supra* note 50, 538 F.2d at 169; *Anderson v. City of Albuquerque,* 690 F.2d 796, 799 (10th Cir.1982). A black woman has been allowed to represent black males and females in a mixed sex and race discrimination suit. *Donaldson v. Pillsbury Co.,* 554 F.2d 825, 830–831 (8th Cir.), *cert. denied,* 434 U.S. 856, 98 S.Ct. 177, 54 L.Ed.2d 128 (1977); *Vuyanich v. Republic Nat'l Bank,* 82 F.R.D. 420, 435 (N.D. Tex.1979). See generally Note, *Discrimination Class Actions Under the Federal Rules of Civil Procedure: The Transformation of Rule 23(b)(2),* 88 Yale L.J. 868 (1979); Note, *The Proper Scope of Representation in Title VII*

discriminatory practices, while others subscribe to a more restrictive "same-impact" [62] doctrine, and in given cases the outcome could be vastly affected. To illustrate, upon an across-the-board challenge a named plaintiff who suffered from only one form of employment discrimination, such as denial of promotion, could represent a class comprising all employees hurt by any of the employer's discriminatory practices. [63] The same-impact approach, however, limits the class to persons who have sustained injuries identical to those of the class representative; for example, a plaintiff discriminato-

rily refused transfer could represent only others denied transfer. [64] This court has yet to choose between these two doctrines, but a selection seemingly would make no difference in the present case. [65] At the very least, then, a remand is necessary to enable a sound determination as to whether appellants share the same injuries with members of the class.

## III

I turn now to appellants' claim for relief, viewing it wholly on a class basis. Invoking board doctrine would enable appellants who filed complaints to represent all persons protected under § 122(a), 31 U.S.C. § 1242(a) (1976), who similarly filed. While each such appellant presents a particularized claim of injury, as class representatives proceeding under this theory they would be entitled to represent all who have been subjected to discriminatory activities of revenue-sharing recipients, and who on that account have filed administrative complaints with ORS, regardless of the specific forms of discrimination respectively complained of.

Resort to the same-impact doctrine, however, yields a similar result here. Appellants claim to represent all members of several protected groups and their organizational counterparts who have filed discrimination complaints with ORS. The gist of the District Court's objection to a class so formulated was that no named representative shares identical injuries with women, or with the handicapped who are not blind. See note 32 supra. This conclusion, I submit, appears to be unsupportable. The interests of women plainly are represented by one, if not more, of the organizational appellants. For example, Operation Push, an organization in Memphis, Tennessee, consists of more than 3,500 residents of that city, Amended Complaint ¶ 8, J.App. 29, and it is inconceivable that not one of these members is female. Additionally, the District Court's assumption that no appellant represents the interests of the handicapped seems similarly vulnerable. I readily acknowledge that appellants' amended complaint did not assert that any one, save Council of and for the Blind, represented the interests of the handicapped; I recognize, too, that Council's constituents are persons handicapped by blindness. It is difficult to imagine, however, that the combined memberships of the seven organizational appellants do not include some persons handicapped by infirmities other than blindness. Appellants' moving papers in the District Court, while not as precise as they might have been, were not so deficient as to permit a confident conclusion that the

*Actions: A Comment on East Texas Motor Freight Sys., Inc. v. Rodriguez, 13 Harv.C.R.–C. L.L.Rev. 175 (1978).*

**62.** Under the same-impact rule, courts require the named plaintiff and class members to suffer the identical injury. For example, several courts have held that a named plaintiff who challenges the defendant's discriminatory promotion practices may not represent a class contesting the defendant's hiring practices. See *Abron v. Black & Decker (U.S.) Inc.*, 654 F.2d 951, 954 (4th Cir.1981); *Hill v. Western Elec. Co.*, 596 F.2d 99, 102–103 (4th Cir.), *cert. denied*, 444 U.S. 929, 100 S.Ct. 271, 62 L.Ed.2d 186 (1979); *Reed v. Arlington Hotel Co.*, 476 F.2d 721 (8th Cir.), *cert. denied*, 414 U.S. 854, 94 S.Ct. 153, 38 L.Ed.2d 103 (1973); *Chavez v. Tempe Union High School Dist.*, 565 F.2d 1087, 1094 n. 10 (9th Cir.1977); *Green v. Brown*, 451 F.Supp. 1266 (E.D.Va.1978). See also *Walker v. World Tire Corp.*, 563 F.2d 918 (8th Cir. 1977); *Tuft v. McDonnell Douglas Corp.*, 581 F.2d 1304 (8th Cir.1978). Similarly, one circuit has refused to allow an individual who had voluntarily terminated her employment prior to the charged acts of discrimination to represent a class of employees affected by those acts. *Hernandez v. Gray*, 530 F.2d 858 (10th Cir. 1976). Another circuit has ruled that a black woman was not an adequate representative of black men and women in a sex and race discrimination suit because she was not injured in the same fashion as the black men. *Payne v. Travenol Laboratories, supra* note 50, 673 F.2d at 811.

**63.** See note 61 *supra*.

**64.** See note 62 *supra*.

**65.** Appellants charge that ORS injured them by failure to process their administrative grievances. Appellants allege that they followed the filing requirements imposed by the Act and that ORS nonetheless refused to act on their complaints. Application of the across-the-

the Administrative Procedure Act,[66] they urged the District Court to examine and evaluate ORS' record on treatment of administrative complaints of discrimination presented under the aegis of the Revenue Sharing Act. Their legal premise is that the stagnation assertedly typifying ORS' performance in that area amounts to final and unlawful agency action for which a corrective injunction is the only adequate remedy. Appellants do not seek situation-specific relief of the type offered by Section 124 of the Act; they do not ask the courts to resolve any question of noncompliance by any particular locality. Rather, they complain that ORS, in administering the flow of revenue-sharing dollars nationwide, has chosen to dispense huge sums in flagrant violation of statutory procedures implementing the nondiscrimination commands of the Act. Appellants fully recognize that

Congress, through Section 124, has conferred upon citizens an opportunity to litigate individual incidents of discrimination encountered in recipient communities, but contend that ORS is not fulfilling its own responsibilities under the Act. ORS, they claim, generally refuses to investigate complaints, to make findings after such few investigations as it conducts, or to secure compliance agreements or impose sanctions following the few findings of noncompliance that have emerged.[67] Appellants urge that the aggregation of numerous instances of inaction and inordinate delay in processing complaints reflects a systemic breakdown beyond remediation by Section 124 suits.

It cannot be doubted that, despite the enactment of Section 124, appellants may resort to the APA for injunctive relief if they are able to qualify under its terms.[68]

interests of women and the handicapped would not be adequately protected.

**66.** Ch. 324, 60 Stat. 237 (1946) (codified as amended in scattered sections of 5 U.S.C.) [hereinafter cited by its familiar acronym]. The APA confers no jurisdiction, but only a cause of action; power to review agency action under the APA rests upon 28 U.S.C. § 1331 (Supp. V 1981). *Califano v. Sanders,* 430 U.S. 99, 105, 97 S.Ct. 980, 984, 51 L.Ed.2d 192, 199 (1977) (§ 1331, not the APA, provides the jurisdiction); *Megapulse, Inc. v. Lewis,* 217 U.S. App.D.C. 397, 404 n. 30, 672 F.2d 959, 966 n. 30 (1982); *Central Hudson Gas & Elec. Corp. v. EPA,* 587 F.2d 549, 555 (2d Cir.1978). Appellants' approach respects this consideration.

**67.** ORS has a history of recalcitrance in suspending or terminating funds to recipients engaged in prohibited conduct. When, in 1976, the 1972 Act was amended, nine members of the House Committee on Finance noted that

[s]ince the passage of the Act, the Secretary has never suspended shared revenues, for a civil rights violation. Even when the Secretary had evidence of such a violation in Chicago he still refused to suspend funds until ordered to do so by the federal court.

House Report, *supra* note 5, at 98 n. 3 (additional views of Representative Drinan and others). The 1976 amendments vividly reflect the legislative effort to correct this inaction, but ORS allegedly has ignored the restated will of Congress as blithely as it did before.

**68.** The APA is unavailable if review thereunder *is precluded by another statute.* APA § 10 (introductory clause), as amended, 5 U.S.C. § 701(a) (1976). The parties point to no such

statute, nor am I aware of any. Agency action presumptively is reviewable absent a contrary congressional intent plainly appearing, *Dunlop v. Bachowski, supra* note 20, 421 U.S. at 567, 95 S.Ct. at 1857, 44 L.Ed.2d at 386 (1975); *City of Chicago v. United States,* 396 U.S. 162, 164, 90 S.Ct. 309, 311, 24 L.Ed.2d 340, 343 (1969); *Abbott Laboratories v. Gardner, supra* note 20, 387 U.S. at 140, 87 S.Ct. at 1511, 18 L.Ed.2d at 686–687, and only upon a clear and convincing showing of legislative purpose may courts restrict access to judicial review. *Weinberger v. Salfi, supra* note 39, 422 U.S. at 767, 95 S.Ct. at 2465, 45 L.Ed.2d at 537.

The enactment of § 124 did not frustrate these established doctrines. It is "a cardinal principle of statutory construction that repeals by implication are not favored," *Radzanower v. Touche Ross & Co.,* 426 U.S. 148, 154, 96 S.Ct. 1989, 1993, 48 L.Ed.2d 540, 546 (1976); accord, *Kremer v. Chemical Constr. Corp.,* 456 U.S. 461, 468, 102 S.Ct. 1883, 1890, 72 L.Ed.2d 262, 271 (1982); *United States v. United Continental Tuna Corp.,* 425 U.S. 164, 168, 96 S.Ct. 1319, 1323, 47 L.Ed.2d 653, 658 (1976); rather, "whenever possible, statutes should be read consistently." *Kremer v. Chemical Constr. Corp., supra,* 456 U.S. at 468, 102 S.Ct. at 1890, 72 L.Ed.2d at 271; accord, *United States v. Borden Co.,* 308 U.S. 188, 198, 60 S.Ct. 182, 188, 84 L.Ed. 181, 190–191 (1939); *Associated Elec. Coop. v. Morton,* 165 U.S.App.D.C. 344, 351 n. 12, 507 F.2d 1167, 1174 n. 12 (1974), *cert. denied,* 423 U.S. 830, 96 S.Ct. 49, 46 L.Ed.2d 47 (1975). There are, however, "two well-settled categories of repeals by implication —(1) where provisions in the two acts are in irreconcilable conflict, . . . and (2) if the later

Appellants allege facts tending to show that only an injunction directing ORS to adhere to statutory requirements can curtail widespread injuries visited upon class members.[69] Accepting for present purposes, as we must, these allegations as true,[70] the critical inquiry is whether, as demanded by the APA, there has been "final agency action for which there is no other adequate remedy in any court." [71] All parties agree, as I do, that ORS' failure to process and resolve administrative complaints in timely fashion constitutes final agency action within the meaning of that requirement.[72] The only matter in dispute is whether there is any other judicial remedy adequate for redress of the derelictions charged to ORS.

The court now answers that question in the affirmative, and limits its approval to individual discrimination suits under Section 124. If, then, ORS' alleged delinquencies are ever to be overcome, and discriminatory uses of revenue-sharing funds are ever to be eradicated, it would become necessary for citizens to sue separately for every locality spending such monies in a discriminatory manner, and to litigate independently every instance of discrimination in the many thousands of jurisdictions participating in revenue sharing. Under the court's ruling, the most the plaintiff in such an action can hope to achieve is suspension or cutoff of funds to the locality involved; ORS' role and accountability would be limited to that of nominal defendant, present solely to enable the court to frame an effective suspension or cutoff order.[73] I respectfully disagree with the court's outcome.

Congress has established two approaches to the problem of discriminatory expenditures of revenue-sharing funds by recipient localities. First and foremost, Congress ordained administrative scrutiny in the manner delineated step-by-step in the Act—a process calculated to uncover latent episodes of discrimination, and thereby to enable enforcement of the nondiscrimination mandate through suspension or cutoff of funding.[74] It is this process that appellants

act covers the whole subject of the earlier one and is clearly intended as the substitute, . . . [b]ut, in either case, the intention of the legislature to repeal must be clear and manifest . . . ." *Radzanower v. Touche Ross & Co., supra,* 426 U.S. at 154, 96 S.Ct. at 1993, 48 L.Ed.2d at 547, quoting *Posadas v. National City Bank,* 296 U.S. 497, 503, 56 S.Ct. 349, 352, 80 L.Ed. 351, 355 (1936). Accord, *Kremer v. Chemical Constr. Corp., supra,* 456 U.S. at 468, 102 S.Ct. at 1890, 76 L.Ed.2d at 276.

No one suggests, nor do I discern, any congressional purpose to displace the APA beyond the narrow reach of § 124. On the contrary, an APA-based injunctive action against ORS, premised upon the agency's failure to perform its statutory duties, was an available form of relief prior to the advent of § 124. See note 20 *supra.* Congress, in amending the Revenue Sharing Act in 1976, evinced by incorporation of § 124 the desire, not to curtail, but rather to augment the rights already enjoyed by citizens. Compare *Natural Resources Defense Council v. Train,* 166 U.S.App.D.C. 312, 322 & n. 55, 510 F.2d 692, 702 & n. 55 (1974) (authority to review administrative action exists under both the APA and § 304 of the Federal Water Pollution Control Act).

**69.** Unlike § 124, the APA does not limit judicial relief to suspension or termination of funding. APA § 10(b), as amended, 5 U.S.C. § 703 (1976), expressly empowers courts to entertain any appropriate form of legal action, including suits for a prohibitory or mandatory injunction.

**70.** *Miree v. DeKalb Cty.,* 433 U.S. 25, 27 n. 2, 97 S.Ct. 2490, 2492 n. 2, 53 L.Ed.2d 557, 561 n. 2 (1977); *Cruz v. Beto,* 405 U.S. 319, 322, 92 S.Ct. 1079, 1082, 31 L.Ed.2d 263, 268 (1972); *Gardner v. Toilet Goods Ass'n,* 387 U.S. 167, 172, 87 S.Ct. 1526, 1529, 18 L.Ed.2d 704, 708 (1967); *Walker Process Equip. v. Food Mach. & Chem. Corp.,* 382 U.S. 172, 175, 86 S.Ct. 347, 349, 15 L.Ed.2d 247, 250 (1965); *Clark v. Uebersee Finanz-Korporation, A.G.,* 332 U.S. 480, 482, 68 S.Ct. 174, 175, 92 L.Ed. 88, 91 (1947).

**71.** APA § 10(c), 5 U.S.C. § 704 (1976). See also APA § 10(b), 5 U.S.C. § 703 (1976).

**72.** "[W]hen administrative inaction has precisely the same impact on the rights of the parties as denial of relief, an agency cannot preclude judicial review by casting its decision in the form of inaction rather than in the form of an order denying relief." *Environmental Defense Fund v. Hardin,* 138 U.S.App.D.C. 391, 397, 428 F.2d 1093, 1099 (1970); see authorities cited *id.* n. 29.

**73.** See Maj.Op. at 1531, n. 68. But see note 20 *supra.*

**74.** See notes 6–11 *supra* and accompanying text.

endeavor to animate by injunction. Secondarily, Congress provided for citizen enforcement of that mandate in individual situations by suits under Section 124 against localities.[75] The issue is whether the Section 124 remedy is an adequate substitute for the sought-after injunction against ORS, and the time-honored test of adequacy is substantial equivalence in terms of practicality and efficiency.[76] In my view, the Section 124 action does not meet that standard.

In the first place, the objectives of the two remedies diverge radically. Appellants' injunction bid is an effort to compel action by ORS itself, compliably with congressional directives, to investigate administrative complaints and either eliminate existing discrimination or suspend or terminate funding. Once ORS begins to honor its statutory responsibilities, neither appellants nor other complaining citizens would need to do more than submit complaints sufficiently informational to trigger investigations.[77] The Section 124 action, on the other hand, is a full-fledged lawsuit directly against the accused locality, with ORS present only nominally, seeking a ban on discrimination or fund-suspension or -cutoff.[78]

These differences themselves demonstrate that Section 124 cannot afford relief substantially equivalent to that obtainable through an injunction ordering ORS to perform the duties Congress has imposed upon it. In the Section 124 action envisioned by the majority, the plaintiff must carry the burden of proof proving ongoing discrimination in the locality, in contrast to the much lighter burden on administrative complainants to show merely that discrimination is more likely than not.[79] Moreover, ORS' restricted role in that Section 124 suit[80] leaves it continuously and completely free to ignore the requirements of the Act, and thus to perpetuate the very course of conduct the injunction suit would attempt to alter. Thus ORS, which Congress explicitly instructed to tackle problems of discrimination, is wholly insulated from judi-

**75.** See notes 7, 18 *supra* and accompanying text.

**76.** Under APA § 10(c), 5 U.S.C. § 704 (1976), as heretofore we have recognized, adequacy of an alternative judicial remedy is to be determined in the manner in which the courts long have been accustomed to making such measurements. *Megapulse, Inc. v. Lewis, supra* note 66, 217 U.S.App.D.C. at 408 n. 57, 672 F.2d at 970 n. 57 (court reads "nothing more into the relevant portion of section 704 than an incorporation of the general rule that the adequacy of alternative legal claims is keyed to the consideration of all claims for equitable or injunctive relief"). See also *General Motors Corp. v. Volpe,* 321 F.Supp. 1112, 1125 (D.Del. 1970). The applicable standard has crystalized in countless cases assessing the capabilities of legal remedies, the inadequacy of which historically has been the essential prerequisite for equitable relief. Mere existence of a remedy at law has not sufficed to warrant denial of equitable intervention, *Gormley v. Clark,* 134 U.S. 338, 349, 10 S.Ct. 554, 557, 33 L.Ed. 909, 914 (1890); see *Investment Co. Inst. v. Board of Gov. of Fed. Reserve Sys.,* 179 U.S.App.D.C. 309, 318–319, 551 F.2d 1270, 1279–1280 (1977); *General Fin. Corp. v. FTC,* 700 F.2d 366, 369 (7th Cir.1983); rather, as the Supreme Court has declared, "the legal remedy, both in respect to the final relief and the mode of obtaining it, [must be] as efficient as the remedy which equity would afford under the same circumstances." *Gormley v. Clark, supra,* 134 U.S. at 349, 10 S.Ct. at 557, 33 L.Ed. at 914. Accord, *Boyce's Ex'rs. v. Gundy,* 28 U.S. (3 Pet.) 210, 215, 7 L.Ed. 655, 657 (1830) ("it is not enough that there is a remedy at law; it must be plain and adequate, or, in other words, as practical and efficient to the ends of justice and its prompt administration as the remedy in equity"); *Harris Stanley Coal & Land Co. v. Chesapeake & O. Ry.,* 154 F.2d 450, 453 (6th Cir. 1946) ("[t]he legal remedy must not only be plain, speedy and adequate, but as adequate to meet the ends of justice as that which the restraining power of equity is competent to grant"); *Local Union 499 v. Iowa Power & Light Co.,* 224 F.Supp. 731, 738 (S.D.Iowa 1964) ("[a]n adequate remedy at law is a remedy which is plain and complete and as practical and efficient to the ends of justice and its prompt administration as a remedy in equity by injunction").

**77.** See notes 6–8 *supra* and accompanying text.

**78.** See notes 18–19 *supra* and accompanying text.

**79.** See notes 7–9 *supra* and accompanying text.

**80.** See note 19 *supra* and accompanying text. But see note 20 *supra.*

cial review; indeed, it may close its eyes to allegations of discrimination, and dispense vast sums of shared revenues to the very entities about which citizens complain.[81]

Not only is Section 124 litigation less efficient from the citizens' viewpoint but impractical as well. Lawsuits are expensive, time-consuming and burdensome. Realistically, the number of Section 124 actions that citizens and their organizations can be expected to bring and maintain is grossly disproportionate to the problem as appellants pose it. With an aggregate citizens effort under Section 124 hardly more than pathetic, the blight of discriminatory expenditures of revenue-sharing funds will remain unabated. And ORS' adamant refusal to discharge its statutory duties will not only deprive affected citizens of the agency's investigative resources, but also of the wholesome influence of an aggressive administrative enforcement policy on compliance across the country.[82] I believe Section 124 not only does not promise a legally adequate remedy, but is tantamount to little or no solution at all.[83]

My colleagues in the majority suggest that the broad-based mandatory order sought by appellants would compel the District Court to supervise ORS' performance under Section 122 in every instance of the

**81.** Continuing irreparable injury has long been a basis for demonstrating inadequacy of another remedy. See, *e.g., Lewis v. S.S. Baune,* 534 F.2d 1115, 1124 (5th Cir.1976); 11 C. Wright & A. Miller, Federal Practice § 2944 at 399–401 (1973). Indeed, to warrant the intervention of equity, the complainant must point to some act done or threatened that will produce such an injury. See *United States v. American Friends Serv. Comm.,* 419 U.S. 7, 11, 95 S.Ct. 13, 15, 42 L.Ed.2d 7, 13 (1974); *Sampson v. Murray,* 415 U.S. 61, 88, 94 S.Ct. 937, 952, 39 L.Ed.2d 166, 185 (1974); *Beacon Theaters v. Westover,* 359 U.S. 500, 506–507, 79 S.Ct. 948, 954, 3 L.Ed.2d 988, 995 (1959). Ofttimes, the concepts of irreparable injury and inadequate remedy are indistinguishable. *Bannercraft Clothing Co. v. Renegotiation Bd.,* 151 U.S.App.D.C. 174, 185 n. 9, 466 F.2d 345, 356 n. 9 (1972), *rev'd on other grounds,* 415 U.S. 1, 94 S.Ct. 1028, 39 L.Ed.2d 123 (1974) (acknowledging frequent interchangeability but noting that "the irreparable injury rubric is intended to describe the quality or severity of the harm necessary to trigger equitable intervention," while, "[i]n contrast, the inadequate remedy test looks to the possibility of alternative modes of relief, however serious the initial injury").

**82.** This conclusion is reinforced by a recent report of the Comptroller General on the potency, or the lack of it, of § 124 on realization of the nondiscrimination goals of the Revenue Sharing Act. General Accounting Office, The Revenue Sharing Act's 1976 Amendments: Little Effect on Improving Administration and Enforcement of Nondiscrimination Provisions (Dec. 10, 1980). The report stresses the importance of "tying civil rights compliance regulations to a program affecting 39 thousand jurisdictions," and notes "the cumulative effect of multiple agency enforcement efforts." *Id.* at 40–41. The study also observes the powerful negative effect on compliance strategies in recipient localities of a perception that ORS was not likely to take enforcement action. *Id.* at 41. The report cites testimony that an effective enforcement program requires a mix of targeted investigations and compliance investigations. *Id.* at 19.

If a varied and energetic agency program is necessary to ensure compliance by revenue-sharing recipients, that objective can hardly be achieved by citizens and organizations trying to represent countless disadvantaged minorities and women in slow, costly lawsuits scattered locality-by-locality about the country. Moreover, appellants are not seeking that sort of situation-specific relief, but instead an alignment of ORS' nationwide performance of statutory demands. The APA's mission is to provide a judicial remedy when none other is adequate, and the Revenue Sharing Act supplies no mechanism by which ORS effectively can be barred from a systemic course of consistent refusal to honor statutory commands. The court's decision today leaves ORS at liberty, as a practical matter, to violate the Act flagrantly and ignore its mandatory statutory duties with impunity. I find this result intolerable, and inconsistent with the will of Congress.

**83.** While, in my view, citizens can exact ORS' compliance with statutory requirements in separate § 124 suits, see note 20 *supra,* that course would expose an additional form of inadequacy. "Where legal remedies require multiple suits involving identical issues against the same defendant, federal equity practice has recognized the inadequacy of the legal remedy and has provided a forum." *Garrett v. Bamford,* 538 F.2d 63, 71 (3d Cir.1976). See *Matthews v. Rodgers,* 284 U.S. 521, 529–530, 52 S.Ct. 217, 221, 76 L.Ed. 447, 454 (1930); *Hale v. Allinson,* 188 U.S. 56, 78, 23 S.Ct. 244, 252, 47 L.Ed. 380, 392 (1903); *New York Stock Exch. v. Bloom,* 183 U.S.App.D.C. 217, 224, 562 F.2d 736, 743 (1977), *cert. denied,* 435 U.S. 942, 98 S.Ct. 1520, 55 L.Ed.2d 538 (1978).

filing of an administrative discrimination complaint and that this role is "more properly conducted by a Congressional subcommittee as part of its oversight function." [84] I disagree, but in any event that is beside the point. The question confronting us is the adequacy of a particular remedy, not the extent to which an alternative remedy may appropriately be utilized. Moreover, injunctive relief is not simply for the asking; feasibility traditionally is a factor tempering judicial decrees, and experience indicates no need for relief of radical scope in consequence of class litigation. Heretofore, when recipients of federal funds have engaged in unlawful discrimination, federal courts have responded unhesitantly by requiring federal agencies dispensing those funds affirmatively to police compliance with statutory nondiscrimination edicts.[85] In my judgment, an injunction directing ORS to perform its statutory functions is the only adequate remedy for the wholesale statutory violations appellants lay at ORS' doorstep.

## IV

The impact of the Revenue Sharing Act is nationwide. Through it, billions of dollars are channeled annually to many thousands of state and local governmental entities. Thus far there has been little assurance that those entities calling upon ORS for large sums of these federal monies actually observe the nondiscrimination requirement of the Revenue Sharing Act. Vindication of this mandate now is left to citizen improvisation on a case-by-case basis, a process leaving untouched a pervasive and repeated agency refusal or failure to obey congressional commands. I think individual Section 124 actions against either recipient localities or ORS, or both, cannot afford adequate relief from that predicament. I therefore would allow appellants' injunctive suit against ORS to proceed if it qualifies as a class action.

The record before us, however, does not permit a full evaluation of the possibility of class-status certification. I am unable, for example, to discern whether appellants could adequately represent a viable class with respect to relief that properly may be sought. Nor can I tell whether the six instances of administrative grievance-handling alleged in appellants' amended complaint [86] are representative of the type and breadth of claims that the class legitimately could assert against ORS. Accordingly, I would remand the case, with a reminder of "the well established rule that the claims of all the class need not be identical to those of the plaintiffs," [87] to enable the District Court to determine, among other things, whether "the individual's claim and the class claims . . . share common questions of law or fact and [whether] the individual's claim will be typical of the class claims." [88] I would also instruct the court to allow discovery to proceed on the question of scope of ORS' alleged inaction, for only thereafter could it be ascertained whether Section 124 relief would serve appellants

84. See Maj.Op. at 1533.

85. See *Adams v. Richardson,* 351 F.Supp. 636, 641–642 (D.D.C.1972), aff'd, 156 U.S.App.D.C. 267, 480 F.2d 1159 (*en banc* 1976) (agency ordered to discharge its statutory responsibility *to cut off funds to discriminating school districts* nationwide); *Green v. Connally,* 330 F.Supp. 1150 (D.D.C.1971), aff'd sub nom. *Coit v. Green,* 404 U.S. 997, 92 S.Ct. 564, 30 L.Ed.2d 550 (1971) (agency ordered to terminate support of a *state's private schools practicing racial discrimination;* agency barred from renewing further monetary assistance until the schools assured full compliance with nondiscrimination standards); *Green v. Kennedy,* 309 F.Supp. 1127 (D.D.C.1970) (agency ordered to disapprove pending and future applications for tax-exempt status for state private schools discriminating racially, and to deny tax-exempt status to contributions to the schools in the absence of an affirmative determination that compliance with nondiscrimination requirements has been attained).

86. See note 12 *supra.*

87. *Taylor v. Safeway Stores,* 524 F.2d 263, 271 n. 8 (10th Cir.1975). Accord, *Donaldson v. Pillsbury Co., supra* note 61, 554 F.2d at 830–831. See also note 48 *supra* and accompanying text.

88. *General Tel. Co. v. Falcon, supra* note 58, 457 U.S. at 157, 102 S.Ct. at 2371, 72 L.Ed.2d at 750. See also note 65 *supra.*

adequately. And I would defer a ruling on the propriety of dismissal of this litigation until it can be made on a fully informed basis.